[Nos. 24965-1-II; 25073-0-II. Division Two. August 17, 2001.]

THE STATE OF WASHINGTON, *Respondent*, v. CLINTON LAMONT LARRY, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. McQUEEN DEE VARNES, *Appellant*.

896

*Linda J. King* and *Rebecca W. Bouchey*, for appellants (appointed counsel for appeal).

*Gerald A. Horne, Prosecuting Attorney*, and *Kathleen Proctor* and *Barbara L. Corey-Boulet, Deputies*, for respondent.

HUNT, J. — Codefendants Clinton Larry and McQueen Varnes appeal their convictions for kidnapping, robbery, and attempted murder of a fast food restaurant manager. The codefendants were tried together. Larry argues that the trial court erred in admitting Varnes' redacted confession. Varnes argues that the redacted statement unfairly excluded exculpatory portions of his confession, and that the prosecutor misstated the law during closing argument. Both argue that they should have had separate trials, that their respective sentences should have run concurrently, and that there was insufficient evidence of premeditated attempted murder. Finding no error, we affirm.

## FACTS

### I. THE CRIMES

Larry and Varnes conspired to rob the nearby Burger King restaurant, where Larry had previously worked. Larry told Varnes how he had previously robbed the restaurant by waiting "for the trash guy to come out and take him inside hostage and make him go through the safe."

Larry gave Varnes a .380 caliber handgun.

Larry and Varnes waited for about two hours outside of the Burger King. At several points, Varnes attempted to initiate the robbery, but he did not go through with the plan. "I went out to do that a few times and I looked at the dude and I was like I didn't, I didn't wanna hurt the dude with the gun, you know." Eventually, Varnes approached the manager, Jorge Rivera, in the parking lot and asked if he had any spare change. When Rivera answered no, Varnes started to walk away. Varnes then ran back and asked Rivera if he had called him; again, Rivera said no.

Larry and Varnes followed Rivera's car to a nearby gas station. Larry harangued Varnes, saying, "[S]top being a bitch, just go in there and get him." With gun in hand, Varnes approached Rivera at the gas pumps, saying, "[M]y friend wants to talk to you." Varnes put Rivera in the back seat of the car in which Larry was waiting and gave the gun back to Larry. All three drove away.

Larry and Varnes stopped for gas at another gas station, using Rivera's five dollars for gas. They then returned to the Burger King, where Larry and Varnes forced Rivera to let them into the restaurant. They removed about $2,500. Varnes then left the restaurant and waited in the car. Larry kept Rivera in the Burger King and made him remove the videotape from the surveillance system.

Larry drove them all to his friend Chad's house, where he told Varnes to grab Rivera and to bring him into the house. Larry told Rivera, "[Y]ou better hope that this is the tape or that's on my unborn child that I'll f[**]kin' kill you." Larry tried to watch the surveillance videotape, but Chad told them to leave.

Larry, Varnes, and Rivera returned to the car. Larry drove to a dead end street, stopped the car, and told Varnes to "let him out." Varnes pulled Rivera out of the car. Before Varnes released Rivera's arm, Larry began shooting from the driver's seat. Larry and Varnes left Rivera, who had multiple gun shot wounds. Rivera managed to reach a

nearby residence for help. The resident called police, who responded, along with medical personnel. Rivera later recovered.

Meanwhile, Larry and Varnes drove to another friend's house, where Larry returned the gun, saying, "I dirtied your gun." Larry and Varnes split the money: Varnes got $300, the gun provider got "a hundred bucks or a hundred and fifty bucks for the gun," and Larry kept the remainder, approximately $2,050. Larry arranged to store the vehicle in northeast Tacoma.

## II. ARRESTS

The day after the shooting, police investigators obtained a videotape from the surveillance camera at the AM/PM mini-mart that showed Varnes walking away with Rivera. The police produced a special videotape, including digital freeze frames, showing Rivera and Varnes, which was broadcast by local television stations.

Police detectives learned that a gold Cadillac was seen leaving the scene of the shooting. The day after the shooting, police set up surveillance of Larry's Cadillac from 3:00 P.M. to 8:00 P.M.; they observed nothing. At about 11:00 P.M., Detective Farrar discovered that the Cadillac was no longer there.

The police arrested Larry two days after the shooting; he asked to speak with an attorney before speaking with police. While in custody, Larry filed a stolen vehicle report for the Cadillac, telling police that the Cadillac had been stolen the week before the robbery and kidnapping. Police eventually located the Cadillac several months later, stored at a home of Larry's friend in northeast Tacoma.

Following up on tips from the Crime Stoppers program, police arrested Varnes three days after the robbery/kidnapping. After his arrest, Varnes immediately began making

statements to the police, even before the *Miranda*[1] warnings were read:

> [H]e started talking about the case, and stated he knew why I was there and that he was sorry that it happened and that he didn't mean for anybody to get shot; he didn't know that that was going to happen; that he only intended on being part of a theft or a robbery to help get some money from this subject and had no idea any shots were going to be fired.

Report of Proceedings (RP) at 441.

### III. TRIAL

The State charged Larry and Varnes with first degree kidnapping, two counts of first degree robbery, and attempted first degree murder. The trial court denied their motions to sever both before trial and at the close of the State's case.

The jury found Larry guilty of attempted first degree murder, first degree kidnapping, and two counts of first degree robbery. The jury found Varnes guilty of attempted second degree murder, kidnapping, and two counts of robbery. The jury also returned special verdicts finding firearm enhancements for each defendant for each count.

The court sentenced Larry to 600 months confinement, and Varnes to 515 months confinement. The court ran the firearm enhancements consecutively with the sentences for the underlying convictions.

### ANALYSIS

#### I. CODEFENDANTS' REDACTED STATEMENTS—*BRUTON*

█ We review de novo alleged violations of the confrontation clause.[2] *United States v. Mayfield*, 189 F.3d 895, 899

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3d 974 (1966).

[2] In *State v. Hieb*, 107 Wn.2d 97, 104-05, 727 P.2d 239 (1986), the court discussed the confrontation clause:

> The United States and Washington constitutions afford a criminal defendant the right to confrontation. The United States Constitution provides: "In all

(9th Cir. 1999); *United States v. Hoac*, 990 F.2d 1099, 1105 (9th Cir. 1993).

In *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), "the United States Supreme Court held that the defendant was deprived of his confrontation rights under the Sixth Amendment when he was incriminated by a pretrial statement of a codefendant who did not take the stand at trial." *State v. Hoffman*, 116 Wn.2d 51, 75, 804 P.2d 577 (1991). But in *Richardson v. Marsh*, 481 U.S. 200, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987), the United States Supreme Court held that a confession redacted to omit all reference to the codefendant fell outside *Bruton*'s prohibition because the statement was not "incriminating on its face" and became incriminating "only when linked with evidence introduced later at trial (the defendant's own testimony)." *Richardson*, 481 U.S. at 208.

The Supreme Court further defined the contours of the *Bruton* rule in *Gray v. Maryland*, 523 U.S. 185, 118 S. Ct. 1151, 140 L. Ed. 2d 294 (1998), in which the prosecution had redacted the nontestifying codefendant's confession by replacing the defendant's name with a blank space or the word "deleted." *Gray*, 523 U.S. at 188. Rejecting this approach, the Court said:

> Redactions that simply replace a name with an obvious blank space or a word such as "deleted" or a symbol or other similarly obvious indications of alteration, however, leave statements that, considered as a class, so closely resemble *Bruton*'s unredacted statements that, in our view, the law must require the same result.

*Gray*, 523 U.S. at 192. The Court reasoned that such statements

---

criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . ." U.S. CONST. amend. 6. The Washington constitution provides: "In criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face . . ." CONST. art. I, § 22 (amend. 10). The federal confrontation right is applicable to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065 (1965).

*Hieb*, 107 Wn.2d at 104-05.

*obviously refer directly to someone, often obviously the defendant,* and . . . involve inferences that a jury ordinarily could make immediately . . . . [T]he accusation that the redacted confession makes "is more vivid than inferential incrimination, and hence more difficult to thrust out of mind."

*Gray,* 523 U.S. at 196 (emphasis added) (quoting *Richardson,* 481 U.S. at 208). The Court would have reached a contrary result had the confession been tailored to read "[m]e and a few other guys" committed the crime, instead of the format used in *Gray*—"[m]e, deleted, deleted, and a few other guys." *Gray,* 523 U.S. at 196-97.

Since *Gray,* the federal Courts of Appeal have issued divergent opinions on whether the use of neutral pronouns in redacted statements adequately protect the nontestifying defendant. Several courts have found neutral pronouns proper: *United States v. Logan,* 210 F.3d 820 (8th Cir. 2000) (use of "another individual" did not violate confrontation clause); *United States v. Verduzco-Martinez,* 186 F.3d 1208, 1213-14 (10th Cir. 1999) (use of "another person" did not violate confrontation clause); and *United States v. Akinkoye,* 185 F.3d 192, 198 (4th Cir. 1999), *cert. denied,* 528 U.S. 1177 (2000) (use of "another person" and "another individual" did not violate confrontation clause).

However, in *United States v. Gonzalez,* 183 F.3d 1315, 1322 (1999), *superseded by regulation on other grounds in United States v. Diaz,* 248 F.3d 1065 (11th Cir. 2001), the court found that a redacted confession implicating a precise number of the confessor's codefendants violated the confrontation clause. Other courts have found that substituted pronouns violated the confrontation clause, but that the error was harmless: *United States v. Vejar-Urias,* 165 F.3d 337, 340 (5th Cir. 1999) (use of "someone" violated confrontation clause, but error was harmless); *McGhee v. Yukins,* 229 F.3d 506, 512 (6th Cir. 2000); and *United States v. Gillam,* 167 F.3d 1273 (9th Cir. 1999)[3] (harmless error although redacted testimony indirectly referred to the non-

---

[3] In *Gillam,* the court discussed the *Bruton* error in light of the strength of the government's case against the nonconfessing defendant:

testifying defendant as "someone who 'worked at FDA' who 'was getting ready to retire' ").

## A. EFFECT OF VARNES' REDACTED STATEMENT ON LARRY

■ The trial court allowed Detective Farrar to testify[4] about a redacted version of Varnes' confession, which contained no mention of Larry by name.[5] *See* notes 5, 8, 9 and

---

The violation of *Gray* in this case is, if anything, more patent. Replacing McGirt's name with "someone who worked at FDA . . . who was getting ready to retire" not only made it clear that Gillam was pointing an accusatory finger at someone else but also left little doubt for the jury that it was the codefendant, McGirt.

. . . The impact of the indirect reference to McGirt was not so devastating that the jury could not be expected to follow the judge's admonition to consider the statement only against Gillam. *See Bruton*, 391 U.S. at 135, 88 S. Ct. 1620 ("It is not unreasonable to conclude that in many such cases [where a *Bruton* error is found] the jury can and will follow the trial judge's instructions to disregard such information."); *United States v. Guerrero*, 756 F.2d 1342, 1348 (9th Cir. 1984) (finding *Bruton* violative admission "not so devastating that the jury could not be expected to disregard it if the district court had instructed them to do so."). In light of the strength of the government's case against McGirt, we find the error to be harmless beyond a reasonable doubt.

*Gillam*, 167 F.3d at 1277 (alteration in original).

[4] Detective Farrar testified about the confession following extensive discussion outside the jury's presence concerning how such testimony would be presented.

[5] Varnes' confession as presented by Detective Farrar:

Q. Did McQueen Varnes tell you what the plan for that evening was initially supposed to be?

A. Yes he did. He said that he was to wait until the trash dude came out and take him inside hostage, make him go through the safe.

Q. Did he tell you whether or not he attempted to do that at the Burger King?

A. He said that he went out to do that a few times and looked at the dude, and he was like, "I didn't want to hurt the dude with the gun."

RP at 542.

Q. Read us his exact quote about that.

A. "So I went out and I put the gun to the dude and I said, my friend wants to talk to you, and that's all I said."

RP at 545-46.

Q. And what did McQueen tell you?

A. "I thought we were just leaving him there, and then he shot the gun."

Q. What did you ask him next?

A. I asked him "Who shot the gun?"

10, *infra*. The State did not introduce a written copy of the confession.[6]

Redacted statements must be (1) facially neutral, i.e., not identify the nontestifying defendant by name (*Bruton*); (2) free of obvious deletions such as "blanks" or "X" (*Gray*); and (3) accompanied by a limiting instruction (*Richardson*). Here, the redacted statements met these three criteria. First, they were facially neutral in that none referred to Larry by name. Second, there were no obvious deletions, especially as introduced through the testimony of Detective Farrar. Third, although Varnes' redacted statements were used only against him, not against Larry, the trial court specifically instructed the jury not to "consider an admission or incriminating statement made out of court by one defendant as evidence against a codefendant."[7]

Nonetheless, Larry challenges the first factor: Even though the statements did not refer to him by name, he claims that Varnes' confession "was not properly redacted to eliminate 'any *reference*' to Larry's '*existence*' and therefore should not have been permitted in the joint trial." Br. of Appellant Larry at 7 (emphasis added) (citing *Richardson*,

---

Q. And his answer?
A. "The driver."

RP at 551.

Q. Did he tell you what happened as he opened the car door?
A. Yes.
Q. Tell us what he said.
A. He said, "I opened the door, and I let him out and was pulling him out and right before I could even let go of his arm, there was shooting. Almost hit me too, and I feel so f[**]king responsible."

RP at 552.

[6] Defense counsel and the prosecutor discussed the redacted printed transcript of Varnes' confession. Larry's defense counsel objected to introduction of the redacted confession, and the State did not offer it.

[7] In *Mayfield*, the court found that the absence of a limiting instruction to the jury was an important factor in finding prejudice to the nontestifying defendant. "The entire focus of the Supreme Court's analysis has been whether a constitutional violation occurred despite the court's limiting instruction and the accompanying presumption that juries follow such instructions." *Mayfield*, 189 F.3d at 902.

481 U.S. at 211). The State counters that the redacted version of Varnes' confession was facially neutral as to Larry and that it was presented in a manner so that the jury was unaware of the redaction.

In testifying about Varnes' confession, Detective Farrar referred both directly[8] and indirectly[9] to a third unnamed person. Some of his references could pertain to Varnes and Rivera[10] and not necessarily to a third person, such as Larry. But the jury could infer from some of the direct references that the third person was Larry. For example, that "the driver" shot the gun while "leaning over the passenger seat" relates primarily to a third individual other than Varnes or Rivera: Since only three persons were present and Rivera was the victim, this statement tends to establish that Varnes was present but was not the shooter and that, instead, inferentially, the third-person-shooter was codefendant Larry.

That the jury could draw such an inference does not

---

[8] References to another person not Rivera (emphasis added throughout): "*[M]y friend* wants to talk to you . . . ." RP at 546. "I asked if *they* just took paper money. He said, no, *they* took paper money and some rolled coin." RP at 547. "When *they* got back—when he got back into the Cadillac . . . ." RP at 547. "I asked him a question, 'You get there, and you stop. That's next?' McQueen answered, '*He* said, 'let him out' ". RP at 550. "I said, 'Okay, Who said let him out?' Q. What did McQueen say? A. *The driver*." RP at 550. "I thought *we* were just leaving him there, and then *he* shot the gun. Q. What did you ask him next? A. I asked him, 'Who shot the gun?' Q. And his answer? A. '*The driver*.' " RP at 551. "Q. Did you ask where the positions of the people were during the time of the shooting? Specifically, did you confirm what *the driver* was doing? A. Yes." RP at 552. "[D]id you ask what *the driver* was doing? . . . 'Where was *the driver* at when *he* was shooting?' . . . A. Oh, '*He* was leaning over the passenger seat.' " RP at 552.

[9] Indirect references to another person not Rivera: Varnes "said he handed off the gun." RP at 546 (emphasis added); "[H]e was asked to pull down the video surveillance tape . . . ." RP at 547; "Did McQueen Varnes tell you that was his idea or he was told to do that? A. He was told to do that." RP at 548.

[10] References can pertain to Varnes and Rivera: "They left the parking lot . . . ." RP at 546. "Did they eventually get back to the Burger King?" RP at 546. "And where did they go from there? A. From the Burger King, they went to Chad Littler's apartment." RP at 547. "That while they were in the car, Jorge's pager and watch was taken from him." RP at 548. "Did they leave Chad's house? A. Yes, they did. Q. Went back into the Cadillac? They got back into the Cadillac." RP at 549. "McQueen told me they were in the same seat positions, Jorge in the back and he in the front passenger." RP at 549. "McQueen stated that they drove down the street." RP at 549.

mean, however, that the redacted statement violated *Bruton*. No matter how carefully redacted, such statements *"obviously refer directly to someone, often obviously the defendant*, and . . . involve inferences that a jury ordinarily could make immediately." *Gray*, 523 U.S. at 196 (emphasis added) (quoting *Richardson*, 481 U.S. at 208). But it is the redacted statement with blanks in place of the codefendant's name that the Supreme Court decries in *Gray* because "the accusation that [such] redacted confession makes 'is more vivid than inferential incrimination, and hence more difficult to thrust out of mind.' " *Id.* (quoting *Richardson*, 481 U.S. at 208). The Court in *Gray* would have upheld admission of the redacted confession had it read "[m]e and a few other guys" committed the crime, instead of "[m]e, deleted, deleted, and a few other guys." *Gray*, 523 U.S. at 196-97. Varnes' redacted statement, which refers to a third person, not a blank, mirrors the redaction format that the Supreme Court approved in *Gray*, in spite of the jury's ability to infer that such third person was the unnamed codefendant.

Furthermore, even if the redacted statement violated *Bruton*, any error was harmless beyond a reasonable doubt. *Gillam*, 167 F.3d 1273. In *Gillam*, the court concluded that the "indirect reference" to the nonconfessing defendant "was not so devastating *that the jury could not be expected to follow the judge's admonition to consider the statement only against Gillam." Gillam*, 167 F.3d at 1277 (Gillam was the confessing codefendant.). Here, not only did the trial court give the jury a cautionary instruction, but also there was substantial independent evidence identifying Larry as the shooter, namely the victim's direct eyewitness testimony. Rivera unequivocally identified Larry as the driver of the vehicle and the shooter. Moreover, the subsequent introduction of Varnes' redacted confession was anticlimactic because it followed this unimpeachable eyewitness testimony from the man that Larry shot. *See Richardson*, 481 U.S. at 208. Thus, even assuming that Varnes' confession was not effectively redacted to satisfy *Bruton* and its

progeny, its admission as to Larry was harmless beyond a reasonable doubt.

### B. REDACTION OF STATEMENTS EXCULPATORY TO VARNES

■ Varnes complains that the redacted version of his confession to Detective Farrar omitted certain statements that exonerated him and implicated Larry. We disagree. The trial court properly followed the rules of evidence in excluding Varnes' exculpatory, out-of-court statements as inadmissible hearsay. ER 801, 802. Such out-of-court statements by a nontestifying party are admissible only if offered *against*, not in favor of, that party. ER 801(d)(2).

Varnes further claims that "[t]he jury also did not hear evidence tending to disprove [t]he critical issue of whether Varnes *knew* Rivera would be shot." Varnes focuses on the comment Larry made to Rivera that "[y]ou better hope this is the tape or I will f[**]kin' kill you. . . . [Varnes] stated he did not say that." But contrary to Varnes' claims in his Appellant's Brief, the record shows that Rivera specifically testified at trial that Larry threatened him concerning the tapes: "Q. Do you remember which one of them said 'This better be the right tape'? A. Clinton."

Moreover, Detective Farrar's testimony specifically included several of Varnes' exculpatory and remorseful statements. Farrar testified that: (1) Varnes said he did not threaten Rivera about the tape; (2) Varnes stated "before I could even let go of his arm, there was shooting. Almost hit me too, and I feel so f[**]king responsible;" (3) Varnes said, "I feel responsible. I pray that the guy will make it, and I hope he does make it. And I'm just sorry that I had to make bad decisions and let people make bad decisions for me and let people use me."

But eyewitness-victim Rivera testified that Varnes had threatened him:

Q. Was McQueen Varnes doing anything to get you out of the car?

A. He was grabbing my arm. I was getting out, and he was grabbing my arm and pulling me out. It was in between pulling me out or making sure I don't run.

Q. Or making sure what?

A. That I don't run.

Q. Did you feel like he was holding on to you pretty tight?

MR. SHAW: Your Honor, that's leading.

THE COURT: Sustained.

Q. Why did you say that you thought maybe he was trying to keep you from running? Why did you think that?

A. All the other times I got out of the car and he was holding me pretty tight, so he kept telling me, "Don't run or I will shoot you," things like that. He kept telling me, "Don't run or else I will shoot you in the back," or things like that.

RP at 289.

■ The redacted version of Varnes' confession excludes some exculpatory information, such as Larry's previous robbery of the same Burger King. But it does not exclude "substantially exculpatory" information concerning Varnes so as to distort the confession, as ruled improper in *State v. Alsup*, 75 Wn. App. 128, 876 P.2d 935 (1994) and *United States v. Kaminski*, 692 F.2d 505, 522 (8th Cir. 1982). Moreover, neither of these cases sacrifice one defendant's right to confrontation and corresponding right to redaction of portions of a codefendant's confession that incriminate the first defendant as well.

■ In *United States v. Haddad*, 10 F.3d 1252 (7th Cir. 1993), the court discussed the "rule of completeness" under the Federal Rules of Evidence:

Ordinarily a defendant's self-serving, exculpatory, out of court statements would not be admissible. But here the exculpatory remarks were part and parcel of the very statement a portion of which the Government was properly bringing before the jury, i.e. the defendant's admission about the marijuana.

Rule 106 of the Federal Rules of Evidence states:

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other

writing or recorded statement which ought in fairness to be considered contemporaneously with it.

As we see, by its terms the rule refers to written or recorded statements. However Rule 611(a) gives the district courts the same authority with respect to oral statements and testimonial proof. See *Weinstein's Evidence* Vol. 1, 106-4 (1992 Ed.) And the Seventh Circuit has applied a Rule 106 analysis with respect to oral statements and testimonial proof. See *United States v. Lewis*, 954 F.2d 1386, 1392 (7th Cir. 1992). Under this Court's decisions the portions of the statement that the proponent seeks to admit must, of course, be relevant to an issue in the case. Even then, the trial judge need only admit the remaining portions of the statement which are needed to clarify or explain the portion already received. See *United States v. Velasco*, 953 F.2d 1467, 1475 (7th Cir. 1992) and *United States v. Sweiss*, 814 F.2d 1208, 1211 (7th Cir. 1987).

Under the test set forth in *Velasco* the Court is to apply a four-part test in order to determine whether the offered portions of the statement is necessary to: 1) Explain the admitted evidence, 2) Place the admitted portions in context, 3) Avoid misleading the trier of fact, and 4) Insure fair and impartial understanding of the evidence. *Velasco* [953 F.2d] at 1475. This Court will not disturb a district court's decision regarding a rule of completeness issue absent an abuse of discretion. *Velasco* [953 F.2d] at 1475.

*Haddad*, 10 F.3d at 1258-59.

ER 106 "is substantially the same as Federal Rule 106." ER 106 cmt. Thus, the same rationale applies here. Also, consistent with *Haddad*, we will not disturb admission of such redacted statements absent an abuse of the trial court's sound discretion. *United States v. Dorrell*, 758 F.2d 427, 434-35 (9th Cir. 1985). Here, unlike in *Haddad*, admission of the redacted portions of the statement were not necessary to clarify the portions that were introduced. We hold that the trial court did not abuse its discretion in admitting Varnes' redacted confession.

## II. SEVERANCE AND SEPARATE TRIALS

"Separate trials are not favored in this state." *State v. Dent*, 123 Wn.2d 467, 484, 869 P.2d 392 (1994);

*State v. Campbell*, 78 Wn. App. 813, 819, 901 P.2d 1050 (1995). Severance of trials is also discretionary with the trial court. We review a trial court's decision on a motion for severance under CrR 4.4(c)(2) for a manifest abuse of discretion. *State v. Wood*, 94 Wn. App. 636, 641, 972 P.2d 552 (1999).

CrR 4.4(c)(2) states in pertinent part:

> (2) The court . . . should grant a severance of defendants whenever:
>
> (i) if before trial, it is deemed necessary to protect a defendant's rights to a speedy trial, or it is deemed appropriate to promote a fair determination of the guilt or innocence of a defendant; or
>
> (ii) if during trial upon consent of the severed defendant, it is deemed necessary to achieve a fair determination of the guilt or innocence of a defendant.

The defendant "must be able to point to specific prejudice" to support a claim that the trial court abused its discretion. *Wood*, 94 Wn. App. at 641. Specific prejudice may be demonstrated by showing:

> "(1) antagonistic defenses conflicting to the point of being irreconcilable and mutually exclusive; (2) a massive and complex quantity of evidence making it almost impossible for the jury to separate evidence as it related to each defendant when determining each defendant's innocence or guilt; (3) a codefendant's statement inculpating the moving defendant; (4) or gross disparity in the weight of the evidence against the defendants."

*State v. Canedo-Astorga*, 79 Wn. App. 518, 528, 903 P.2d 500 (1995) (quoting *United States v. Oglesby*, 764 F.2d 1273, 1276 (7th Cir. 1985)). The defendants have demonstrated none of these examples of prejudice here.

Larry's and Varnes' defenses were not mutually exclusive, even though each tried to shift the blame elsewhere. At trial, Varnes conceded committing the kidnapping. He argued that Larry was "calling the shots," that he (Varnes)

"was an idiot errand boy who was asked to take him [Rivera] out of the car," but there "is no evidence to show that [McQueen Varnes] wanted Jorge Rivera to get shot." Larry argued that he was not the shooter, but rather a fourth person (Philip Johnson) was the shooter, that Jorge Rivera was lying, and that the police intimidated witnesses. These claims were not mutually exclusive; consequently, the jury would not have had to believe one defendant and disbelieve the other. *Canedo-Astorga*, 79 Wn. App. at 528. The trial court did not abuse its discretion in declining to sever the trials. *State v. Grisby*, 97 Wn.2d 493, 506, 647 P.2d 6 (1982).

### III. Sufficiency of Evidence—Premeditated Attempted Murder

### A. Larry

██ ██ Larry contends that the State failed to present sufficient evidence to show that he premeditated the attempted murder of Rivera. Evidence is sufficient to support a conviction if, viewed in the light most favorable to the prosecution, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Premeditation is the deliberate formation of and reflection upon the intent to take a human life that must involve more than a moment in time. RCW 9A.32.020(1); *State v. Ortiz*, 119 Wn.2d 294, 312, 831 P.2d 1060 (1992).

██ The record contains sufficient evidence to support the jury's verdict that Larry shot Rivera with premeditation. Larry and Rivera were acquaintances who had worked together for a short time at Burger King and had driven together to a birthday party. Larry planned the Burger King robbery and arranged to obtain a gun. He threatened Rivera multiple times during the robbery and kidnapping. Early on, Larry said to Rivera, "[Y]ou better hope that this is the tape or that's on my unborn child that I'll f[**]kin' kill you." As they were leaving the Burger King, Larry told

Rivera, "Don't run or I'll shoot you." Later, at the shooting site, Larry ordered Rivera, "Okay. This is—get out of the car." "You know what I got to do now." As Varnes was pulling Rivera from the car, Larry leaned over from the driver's seat and fired seven shots at Rivera's torso at close range.

## B. VARNES

Varnes claims that the trial court erred by denying his motion to dismiss the charge of attempted first degree murder after the presentation of the State's case for insufficient evidence. First, the jury convicted Varnes of attempted *second* degree murder. Thus, insofar as Varnes' argument on appeal focuses on attempted murder *first* degree, this argument is moot.

We next turn to Varnes' argument that the evidence was insufficient to show that he was an accomplice to Larry's shooting of Rivera. On appeal, we determine " ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime *beyond a reasonable doubt.*" ' " *State v. Theroff*, 95 Wn.2d 385, 388, 622 P.2d 1240 (1980) (quoting *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980)). Applying this standard, we agree with the State that there was sufficient evidence to support the jury's determination that Varnes was guilty of attempted murder. The record contains sufficient evidence from which the jury could reasonably infer that when Varnes pulled Rivera from the car, Varnes either intended Rivera to die or should have known that Larry intended to kill him. Although Varnes argues to the contrary, the record supports an inference that Varnes held Rivera for that purpose while Larry shot Rivera seven times in the torso at close range.

Varnes argues that he could not have intended to assist Larry with Rivera's murder because he was holding Rivera so closely that he almost was shot himself. It is not unprecedented for an accomplice to hold his victim while a

codefendant shoots the victim. Most of these cases involve shooting the victim in the head. *See, e.g., Parks v. State*, 264 Ind. 538, 348 N.E.2d 21, 22 (1976); *State v. Roby*, 463 N.W.2d 506, 509 (Minn. 1990). Other instances where an accomplice holds the victim while another does the shooting, often at close range, involve gang-related activities. *See People v. Son*, 79 Cal. App. 4th 224, 93 Cal. Rptr. 2d 871 (2000) (the defendant took the victim "Nick from the car" and held "Nick while Smann shot Nick"); *People v. Jackson*, 223 Ill. App. 3d 1045, 586 N.E.2d 341, 343 (1991); *Commonwealth v. Perez*, 444 Pa. Super. 570, 664 A.2d 582, 585 (1995) (during a robbery, Perez held the victim's arms while his partner shot him.)

Here, the jury heard and obviously rejected Varnes' statement that he "didn't know he was going to shoot." Rivera testified that at the time of the shooting Varnes "was grabbing my arm and pulling me out. It was in between pulling me out and making sure I don't run." There was sufficient evidence to support the jury's determination that Varnes was guilty of attempted murder. *Theroff*, 95 Wn.2d at 388.

IV. CLOSING ARGUMENT

■ Varnes contends for the first time on appeal that, during closing argument, the prosecutor misstated the law on accomplices, thereby causing the jury to convict him without proof beyond a reasonable doubt.[11] But Varnes failed to object below. Thus, he has waived this claim of

---

[11] In closing argument, the State argued:

All the State has to show, according to the definition of "knowledge," which is Instruction No. 8 in your packet, is that if a person has facts or circumstances that would let a *reasonable person* like the 12 of you conclude that a crime was going to occur, then you are allowed to find that McQueen Varnes had the knowledge or sure as heck should have had the knowledge.

RP at 721. The State argued two theories of accomplice liability: (1) Varnes was an accomplice to attempted murder because it was reasonably foreseeable that Rivera would be shot at the conclusion of their criminal enterprise; and (2) Varnes was liable as an accomplice because he did nothing to stop Larry from shooting Rivera, he did not withdraw from the criminal activity, and he dragged Rivera out of the car while Larry began shooting.

error. *State v. Hoffman*, 116 Wn.2d 51, 93, 804 P.2d 577 (1991).

Nor does Varnes qualify for an exception to this rule of waiver because he has not shown that "the remark [was] so flagrant and ill intentioned that it evince[d] an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." *Hoffman*, 116 Wn.2d at 93. We review allegations that the prosecutor misstated the law in closing argument under this same standard. *State v. Bryant*, 89 Wn. App. 857, 950 P.2d 1004 (1998).

## V. SENTENCING

### A. MERGER—KIDNAPPING/ROBBERY

Under RCW 9.94A.400(1)(a), multiple offenses are counted as a single offense for sentencing purposes if they "require the same criminal intent, are committed at the same time and place, and involve the same victim." *See State v. Tili*, 139 Wn.2d 107, 985 P.2d 365 (1999).

1. Separate Criminal Conduct

██ Both Larry and Varnes argue that the multiple offenses of robbery and kidnapping should count as one crime for sentencing purposes because they "require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.400(1)(a). We will not reverse a trial court's decision on same criminal conduct absent an abuse of discretion or misapplication of the law. *Tili*, 139 Wn.2d at 122. We find none here.

██ The Supreme Court has outlined the requirements for determining whether multiple offenses encompass the same criminal conduct and should, therefore, be treated as one crime at sentencing:

Taken together, RCW 9.94A.400(1)(a) and *Dunaway* require three elements: the same objective criminal intent (which can be measured by determining whether one crime furthered another), the same time and place, and the same victim. If any one element is missing, multiple offenses cannot be said to

encompass the same criminal conduct, and they must be counted separately in calculating the offender score.

*State v. Lessley*, 118 Wn.2d 773, 778, 827 P.2d 996 (1992) (citing *State v. Dunaway*, 109 Wn.2d 207, 743 P.2d 1237 (1987)).

 Varnes concedes that there were different victims for the two robberies, Rivera and Burger King, and that "[t]he trial court did not err in treating the Burger King robbery as a separate crime." Larry cannot show otherwise. Although the kidnapping and robbery of Rivera involved the same victim, the kidnapping occurred over a period of time and in several locations, whereas the robbery occurred at a single time and place, not the same as that involved in the kidnapping. Moreover, comparing the two statutes demonstrates that there are different objective criminal intents for robbery and kidnapping.[12]

2. Sentencing Court Discretion

In *Lessley*, the court held that the trial court has discretion to impose punishment for burglary and an additional crime, even where the additional crime may involve the same criminal conduct under the SRA:

> Because, under the SRA, sentences run concurrently, a defendant is actually punished only for the offense that yields the highest offender score. . . . [T]o give defendants the same punishment they would have received if they had committed only a first degree kidnapping and never engaged in a burglary is not proportionate treatment.
>
> We believe the better approach is to hold the antimerger statute gives the sentencing judge *discretion* to punish for

---

[12] As applicable here, kidnapping in the first degree involves intentionally abducting a person with the intent to facilitate commission of any felony. RCW 9A.40.020. "Abduct" means to restrain a person by using or threatening to use deadly force. RCW 9A.40.010(2). A person commits robbery when he takes personal property from the person of another or in his presence against his will by the use or threatened use of immediate force, violence, or fear of injury to that person. RCW 9A.56.190. " '[B]urglary and kidnapping are not the same criminal conduct because the intent was not the same for both crimes.' " *State v. Brett*, 126 Wn.2d 136, 170, 892 P.2d 29 (1995) (quoting *Lessley*, 118 Wn.2d at 778).

burglary, even where it and an additional crime encompass the same criminal conduct.

*Lessley*, 118 Wn.2d at 781 (emphasis added). Both our court[13] and Division One[14] have upheld the discretion of the trial court in charging and punishing defendants under the burglary antimerger statute. And more recently in *Tili*, 139 Wn.2d at 122-23, the Court held that an appellate court will not reverse a trial court decision on same criminal conduct absent abuse of discretion or misapplication of the law.

Similarly here, the trial court has discretion to punish the kidnapping separately from robbery for sentencing purposes because, as in *Lessley*, to do otherwise would allow a serious crime to go unpunished. RCW 9A.52.050; *Lessley*, 118 Wn.2d at 781. Here, the record does not show that the trial court abused that discretion in treating the kidnapping and robbery as separate offenses and punishing Varnes and Larry for both crimes.

### B. FIREARM ENHANCEMENT

Larry and Varnes next argue that their firearm enhancements should run concurrently, not consecutively, because the robbery and kidnapping constitute "one offense" under RCW 9.94A.400. Having rejected their argument that these two convictions constitute one offense for sentencing purposes, we turn to the question of whether the firearm enhancements should run consecutively or concurrently with respect to the sentences for the underlying substantive crimes and with respect to each other.

The State argues that RCW 9.94A.310(3) requires the firearm enhancement sentences to run consecutively, both to the underlying sentence and to each other:

(3) . . . If the offender is being sentenced for more than one offense, the firearm enhancement or enhancements must be added to the total period of confinement for all offenses,

---

[13] *State v. Kisor*, 68 Wn. App. 610, 617-18, 844 P.2d 1038 (1993).

[14] *State v. Davis*, 90 Wn. App. 776, 954 P.2d 325 (1998).

regardless of which underlying offense is subject to a firearm enhancement. . . .

. . . .

(e) Notwithstanding any other provision of law, all firearm enhancements under this section are mandatory, shall be served in total confinement, and shall run consecutively to all other sentencing provisions, including other firearm or deadly weapon enhancements, for all offenses sentenced under this chapter.

RCW 9.94A.310(3). We agree.

██ We recently addressed this issue in *State v. Price*, 103 Wn. App. 845, 861, 14 P.3d 841 (2000), *review denied*, 143 Wn.2d 1014, 22 P.3d 803 (2001), and held that "firearm enhancements should run consecutively to the base sentences, and consecutively to each other. Consecutive sentencing is mandatory, and the trial court did not err." *Price*, 103 Wn. App. at 861 (citing *State v. Flett*, 98 Wn. App. 799, 806, 992 P.2d 1028, *review denied*, 141 Wn.2d 1002, 10 P.3d 404 (2000)). Nor did the trial court err here.

Affirmed.

ARMSTRONG, C.J., and HOUGHTON, J., concur.

Reconsideration denied December 19, 2001.