[Nos. 35492-6-II; 35499-3-II;    Division Two.    October 28, 2008.]
35502-7-II.

THE STATE OF WASHINGTON, *Respondent*, v. DANIEL CARL JOHNSON ET AL., *Appellants*.

278

*Lisa E. Tabbut*; *Peter B. Tiller* (of *The Tiller Law Firm*); and *Mark W. Muenster*, for appellants.

*Arthur D. Curtis, Prosecuting Attorney*, and *Michael C. Kinnie, Deputy*, for respondent.

¶1 VAN DEREN, C.J. — Daniel Johnson, Jason Balaski, and Michael Odell[1] each appeal their convictions for one

---

[1] Odell's name is incorrectly spelled as "O'Dell" in the report of proceedings.

count of first degree murder, two counts of first degree assault, and one count of first degree burglary. They variously contend that (1) the record is insufficient to allow appellate review, (2) the trial court erred when it denied their motions to sever, (3) the evidence is insufficient to support their convictions for the first degree assault of Laura Harrington, (4) the trial court improperly granted a continuance to Balaski and Odell over Johnson's objection, (5) the trial court erred when it denied their motions to suppress evidence, (6) a juror should not have been seated because he had met a victim at the crime scene, (7) Johnson received ineffective assistance of counsel, (8) the trial court erred in denying Odell's motion for a mistrial because Balaski's counsel commented on Odell's silence during opening statements, (9) the trial court erred in sentencing Odell for two crimes that encompass the same criminal conduct, and (10) cumulative error deprived them of a fair trial. Finding no error, we affirm.

## FACTS

### I. BACKGROUND

¶2 Adrian Rekdahl, Johnson, Balaski, and Odell planned to unlawfully enter Gerald Newman's house in Vancouver, Washington, and steal $1.2 million. On August 6, 2005, Rekdahl asked Johnson to meet him at a Portland, Oregon, area nightclub. When Johnson arrived, Rekdahl, Balaski, and Odell were already there. The four men discussed "a plan to get some money." Report of Proceedings (RP) at 2586. They left the nightclub, planning to meet at Odell's glass shop after Johnson purchased two sets of two-way radios.

¶3 Johnson armed himself and went to Odell's shop, where he found Balaski and Rekdahl already wearing camouflage clothing. Johnson also changed into camouflage pants and boots. Odell's wife brought his Chevrolet Tahoe to the shop and left on foot. Odell drove them to Newman's house because he had earlier followed Newman home from a bar and knew where he lived.

¶4 Odell stopped the car near Newman's house and Balaski, Johnson, and Rekdahl exited the vehicle. They all carried firearms and wore face masks as they approached Newman's residence from the backyard and walked around the house to the front door. When they entered the house, Newman ran toward them from the kitchen. Rekdahl shot Newman and, then, Johnson subdued Newman by repeatedly hitting him with his pistol.

¶5 Rekdahl and Balaski ran toward the kitchen and backyard. Newman's guests, Laura and Robert Harrington,[2] ran out the back door, but Laura fell and her husband knelt down beside her. Either Rekdahl or Balaski stood over the Harringtons and pointed a gun at them. The Harringtons pleaded with the gunman, telling him they could not identify him and they had children and grandchildren; then they got up and started running across the yard. As they ran, Laura heard a gunshot and her husband raised his arms and cried out, "God, oh my God." RP at 717. She ran to a hedge and heard four or five more gunshots in quick succession. She crawled under the hedge and across the street to hide next to a curb.

¶6 Rekdahl returned to the foyer and began beating Newman with a rifle. Laura heard one of the men looking for her in the shrubbery and feared that he would shoot her. Someone from the front of the house yelled, "Come on, man, we gotta get the fuck outta here." RP at 718. Laura then heard the man retreat back into the house. The men exited through the front door and Odell drove them away in the Tahoe.

¶7 While driving away, Odell asked, "Did you kill him? Did you kill the motherfucker?" Balaski replied, "He's dead," and Odell pumped his fist in the air and said, "Yes." RP at 2598-99. According to Johnson, this was the first time he realized the men planned a murder rather than a burglary to obtain money.

---

[2] Because Robert and Laura Harrington share the same last name, we refer to them as Robert and Laura. We intend no disrespect.

¶8 Newman's neighbor let Laura into his home and called 911. Another neighbor also called 911 and reported that an unfamiliar white Chevrolet Tahoe left the scene shortly after the shooting. And a security guard reported the Tahoe and its license plate number.

¶9 Vancouver Police Sergeant Joseph Graaff found Newman lying in a bedroom with severe wounds to his head and leg. Newman identified the assailants as three black men wearing ski masks and camouflage clothing. Graaff also learned that Robert was dead in the backyard.

¶10 Clark County Deputy Sheriff Todd Young heard the dispatch about the shooting, including the Tahoe's license plate number. He spotted the Tahoe, radioed for backup, followed the Tahoe, and signaled with his lights for the vehicle to pull over. When the four men exited the vehicle, he activated his lights and spotlight, drew his gun, and ordered the men to get down. Three of them did, but Rekdahl fled.

¶11 Police later found Newman's blood on Johnson's clothing and trace gunshot residue on Johnson's and Balaski's hands. Police executed search warrants for the Tahoe, Rekdahl's pickup truck, and various buildings, including Odell's home and shop.

II. PROCEDURE

¶12 The State charged Rekdahl, Johnson, Balaski, and Odell with the first degree felony murder of Robert Harrington predicated on first degree burglary (count I), first degree assault of Newman (count II), first degree assault of Laura Harrington (count III), and first degree burglary (count IV). The State alleged firearm enhancements for each count.[3] The State elected not to join Rekdahl's case because he was unavailable at the time of trial.

¶13 On February 8, 2006, Balaski and Odell waived speedy trial and asked for a continuance. The trial court

---

[3] These charges are set forth in the third amended information for Rekdahl, Balaski, and Odell and the fourth amended information for Johnson.

granted the motion over Johnson's objection. All defendants unsuccessfully challenged Young's detention of the Tahoe, and Odell unsuccessfully challenged the search warrants for his home and shop. Johnson, Balaski, and Odell also repeatedly moved to sever their trials, but the trial court denied the motions.

¶14 The jury returned guilty verdicts on all counts and found that the men were armed with firearms. Johnson, Balaski, and Odell appeal.

## ANALYSIS

I. SUFFICIENCY OF RECORD FOR APPELLATE REVIEW

■ ¶15 We first address Johnson's claim that the trial court record is insufficient to allow our review. The record in a criminal case must be " 'of sufficient completeness' " for appellate review of potential errors. *State v. Larson*, 62 Wn.2d 64, 67, 381 P.2d 120 (1963) (emphasis omitted) (internal quotation marks omitted) (quoting *Draper v. Washington*, 372 U.S. 487, 499, 83 S. Ct. 774, 9 L. Ed. 2d 899 (1963)). But a " 'complete verbatim transcript' " is not required. *State v. Tilton*, 149 Wn.2d 775, 781, 72 P.3d 735 (2003) (quoting *Mayer v. City of Chicago*, 404 U.S. 189, 194, 92 S. Ct. 410, 30 L. Ed. 2d 372 (1971)). If a reconstructed record fails to recount satisfactorily events material to appellate issues, we must order a new trial. *Tilton*, 149 Wn.2d at 783. Such is not the case here.

■ ■ ¶16 Here, the trial court used a tape recording system rather than a court reporter. When the speaker strayed too far from a microphone or two people spoke at once, the recording was inaudible or unintelligible to the individual who prepared the written appellate record. Equipment failure caused further problems in recording and playback. These problems resulted in numerous short gaps in the over 3,000 page report of proceedings.

¶17 But we hold that the record is sufficient. It was sufficiently complete to allow three appellate attorneys and

Johnson, in his statement of additional grounds for review,[4] to identify and argue numerous issues on appeal. Moreover, the gaps in the record have not hampered our review. Although imperfect, the record is sufficient.[5]

## II. DENIAL OF MOTIONS TO SEVER TRIALS

¶18 Johnson, Balaski, and Odell argue that the trial court erred when it denied their repeated motions to sever their trials. Specifically, Balaski and Odell claim severance was required because their defenses were mutually antagonistic to Johnson's defense, given that he testified against them. Odell further argues that, regardless of whether their defenses were mutually antagonistic, Johnson's testimony against him required severance.[6]

### A. Standard of Review

¶19 The decision to proceed with joint or separate trials is entrusted to the trial court's sound discretion; we will not disturb the decision absent manifest abuse of discretion. *State v. Grisby*, 97 Wn.2d 493, 507, 647 P.2d 6 (1982). Washington law disfavors separate trials. *Grisby*, 97 Wn.2d at 506. The trial court should sever defendants' trials at any point in the trial whenever, "upon consent of the severed defendant, it is deemed necessary to achieve a fair determination of the guilt or innocence of a defendant." CrR 4.4(c)(2)(ii). Trial courts properly grant such severance

---

[4] RAP 10.10.

[5] Johnson also frames this as an issue of ineffective assistance of counsel because his attorney did not object to the record under RAP 9.5(c) or ask the trial court to reconstruct it. Because there was no error on the merits, we hold that Johnson's attorney did not perform deficiently.

[6] The State argues that Balaski waived any severance claim when he withdrew his motion to sever at the beginning of trial in exchange for the State's agreement to not introduce Odell's out-of-court statement that Balaski was in the Tahoe and gave directions to Newman's house. *See* CrR 4.4. But when Balaski waived his severance claim, he did not know that Johnson would testify against him. After this became clear, Balaski brought a new motion to sever. We do not deem Balaski's waiver to extend to this unforeseen situation. All three appellants complied with the CrR 4.4(a)(2) requirement to renew their severance motions; thus, they did not waive their right to appeal this claim.

motions only if a defendant demonstrates that a joint trial would be "so manifestly prejudicial as to outweigh the concern for judicial economy." *State v. Hoffman*, 116 Wn.2d 51, 74, 804 P.2d 577 (1991).

¶20 A "defendant must be able to point to specific prejudice" to demonstrate that the trial court abused its discretion. *Grisby*, 97 Wn.2d at 507. " '[A]ntagonistic defenses conflicting to the point of being irreconcilable and mutually exclusive' " may cause specific prejudice. *State v. Canedo-Astorga*, 79 Wn. App. 518, 528, 903 P.2d 500 (1995) (quoting *United States v. Oglesby*, 764 F.2d 1273, 1276 (7th Cir. 1985)); *see also State v. Jones*, 93 Wn. App. 166, 171, 968 P.2d 888 (1998). But mutually antagonistic defenses are not per se prejudicial as a matter of law. *Grisby*, 97 Wn.2d at 507.

### B. The Defenses

¶21 Johnson, Balaski, and Odell argue that their defenses were mutually antagonistic. Johnson argued, as his defense, that he understood the plan to involve a burglary at Newman's house, not a murder. Balaski asserted an alibi defense. Lastly, Odell claimed that he drove the Tahoe but was ignorant of any plan the others had to commit crimes at Newman's house.

■■■■■ ¶22 Our Supreme Court has held:

> The fact that the interests of all the participants in a crime conflict does not require that the court grant each of several participants a separate trial. Such conflicts invariably will be present "where two or more persons are tried for the same crime . . . ." and if such conflicts are "regarded as requiring a separate trial, it is at once plain that the statute is rendered nugatory, and joint trials will be the exception and not the rule. But such was not the intent of the legislature."

*State v. Davis*, 73 Wn.2d 271, 290, 438 P.2d 185 (1968) (alteration in original) (quoting *State v. Clark*, 156 Wash. 47, 51, 286 P. 69 (1930)). "The mere existence of antagonism between defenses 'or the desire of one defendant to excul-

pate himself by inculpating a codefendant . . . is insufficient to [compel separate trials].' " *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 712, 101 P.3d 1 (2004) (alterations in original) (footnote omitted) (quoting *United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996)). Rather, the defendant must " 'demonstrate[ ] that the conflict is so prejudicial that . . . the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' " *Grisby*, 97 Wn.2d at 508 (quoting *United States v. Davis*, 623 F.2d 188, 194-95 (1st Cir. 1980)). For defenses to be irreconcilable, they must be "mutually exclusive to the extent that one [defense] must be believed if the other [defense] is disbelieved." *State v. McKinzy*, 72 Wn. App. 85, 90, 863 P.2d 594 (1993).

¶23 We rarely overturn a trial court's denial of a motion to sever on the basis of mutually exclusive defenses, even when one defendant tries to blame another. In *State v. Medina*, we held that the defendants did not have mutually antagonistic defenses when the evidence showed that two or more people assaulted the victim and both defendants denied that they hit him. 112 Wn. App. 40, 53, 48 P.3d 1005 (2002). The evidence showed that about six people were in the group that attacked the victim, but the victim did not know how many people actually hit him. *Medina*, 112 Wn. App. at 43. Thus, the jury's disbelief of one defendant's claim of innocence did not compel its belief in the other's claim of innocence, so no conflict arose implying that both were guilty. *Medina*, 112 Wn. App. at 53.

¶24 In *State v. Larry*, we held that attempted murder defenses were not mutually exclusive when Varnes argued that he never formed the intent to kill and that his codefendant, Larry, " 'call[ed] the shots.' " 108 Wn. App. 894, 911, 34 P.3d 241 (2001). Larry said a fourth person was the shooter. These defenses were not irreconcilable because a jury could believe both Varnes' and Larry's defenses by concluding that neither man was guilty. *See Larry*, 108 Wn. App. at 911-12.

¶25 And in *Grisby*, our Supreme Court held that defendants Frazier and Grisby did not demonstrate mutually exclusive defenses to five first degree aggravated murder charges. 97 Wn.2d at 508. One or both men killed three adults and two children and wounded two adults; one of the wounded was Grisby. Frazier and Grisby both admitted that they went to the victim's apartment to complain about the drugs he sold them. Frazier admitted that he opened fire on the apartment's occupants and wounded Grisby. But Frazier said he emptied one gun, dropped it, and then fled; Grisby said he was unarmed and left when the shots were fired. *Grisby*, 97 Wn.2d at 496. The court held that these were not mutually antagonistic defenses because the two defenses were largely similar, agreeing on every fact except for blaming one another for shooting the victims. *Grisby*, 97 Wn.2d at 508.

¶26 *Grisby* presented a factual scenario in which "one [or more] defendant[s] sought to escape conviction by placing the guilt on his co-defendant." Wade R. Habeeb, Annotation, *Antagonistic Defenses as Ground for Separate Trials of Codefendants in Criminal Case*, 82 A.L.R.3d 245, 260 (1978); *see Grisby*, 97 Wn.2d at 508. Federal courts have held that severance is not required on this basis alone, and the *Grisby* court adopted the federal standard. 97 Wn.2d at 508. Thus, the rule in Washington is that " 'the desire of one defendant to exculpate himself by inculpating a codefendant . . . is insufficient to [compel separate trials].' " *Davis*, 152 Wn.2d at 712 (alterations in original) (quoting *Throckmorton*, 87 F.3d at 1072).

¶27 Here, Johnson tried to exculpate himself by blaming his codefendants. Johnson's testimony did little to exonerate him because he essentially admitted to every element of every charge against him except for the assault on Laura. Like Varnes, Johnson admitted that he participated in the crimes, but he claimed that his codefendants were the masterminds who were more culpable. *Larry*, 108 Wn. App. at 911-12.

¶28 Johnson, Balaski, and Odell failed to show that their defenses were irreconcilable, i.e., "that one [defense] must be believed if the other [defense] is disbelieved." *McKinzy*, 72 Wn. App. at 90. If the jury believed Odell's argument that he was an unwitting participant in the crimes, it need not have disbelieved Johnson's defense that he planned to participate in only a burglary and not a murder. If the jury believed Johnson's defense of ignorance of the murder plan, it was not required to disbelieve that Odell participated unwittingly. Thus, Johnson's and Odell's defenses were not irreconcilable.

¶29 Similarly, if the jury believed Balaski's alibi defense, it did not need to disbelieve Johnson's claim that he did not plan to participate in a murder. Conversely, it could have believed Johnson without disbelieving that Balaski had an alibi. Because the defenses were not mutually antagonistic, the trial court did not err in refusing to sever the trials. Under Washington law, Johnson's attempt to exculpate himself by blaming his codefendants is not a legally sufficient reason to sever the codefendants' trials and, thus, Johnson, Balaski, and Odell fail to persuade us that the trial court erred when it denied their motions to sever on this ground.

¶30 Furthermore, the trial court gave appropriate cautionary jury instructions. *See Grisby*, 97 Wn.2d at 509 (holding these instructions are relevant to whether failure to sever caused prejudice). The trial court instructed the jury that "[y]our verdict on one count as to one defendant should not control your verdict on any other count or as to any other defendant." Odell Clerk's Papers (Odell CP) at 376. The trial court also instructed:

> The testimony of an accomplice should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find a defendant guilty upon such testimony alone unless, after carefully considering the testimony, you are satisfied beyond a reasonable doubt of its truth.

Odell CP at 384. We presume that jurors follow instructions. *State v. Kroll*, 87 Wn.2d 829, 835, 558 P.2d 173 (1976). The trial court did not err in refusing to sever Johnson's, Balaski's, and Odell's trials.

## C. Johnson's Statement Inculpating Odell

¶31 Odell further argues that severance was warranted solely because Johnson testified against him. Odell cites *Canedo-Astorga*, in which we held that a defendant may demonstrate specific prejudice warranting severance by showing

> "(1) antagonistic defenses conflicting to the point of being irreconcilable and mutually exclusive; (2) a massive and complex quantity of evidence making it almost impossible for the jury to separate evidence as it related to each defendant when determining each defendant's innocence or guilt; (3) a codefendant's statement inculpating the moving defendant; (4) or gross disparity in the weight of the evidence against the defendants."

79 Wn. App. at 528 (quoting *Oglesby*, 764 F.2d at 1276). Specifically, Odell argues that he has demonstrated prejudice under the third standard because Johnson's testimony was a statement that implicated both him and Balaski.

¶32 The word "statement" relates to confessions, not testimony. *Canedo-Astorga* quoted *Oglesby* for this rule and *Oglesby*, in turn, relied on *United States v. Holleman*, 575 F.2d 139 (7th Cir. 1978). In *Holleman*, a defendant sought severance because his codefendant's confession implicated him. 575 F.2d at 142-43. Accordingly, the *Holleman* court analyzed the case under the rule for severance based on a codefendant's confession that the United States Supreme Court established in *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).

¶33 Under *Bruton*, a criminal defendant may be entitled to severance if (1) his codefendant implicates him in a confession, (2) the confession is introduced into evidence without sufficient redaction, and (3) the defendant who confessed

does not testify and is, therefore, not subject to cross-examination. 391 U.S. at 126; *see also* M.O. Regensteiner, Annotation, *Right to Severance Where Codefendant Has Incriminated Himself*, 54 A.L.R.2d 830 (1957); 53-55 A.L.R.2d Later Case Service 311 (2000) (see annotations) (analyzing right to severance when a codefendant incriminates himself). Such a scenario deprives a criminal defendant of the constitutional right to confront and cross-examine witnesses against him. *Bruton*, 391 U.S. at 126. Because the *Bruton* rule rests on the right to cross-examination, severance is not warranted if the confessing defendant testifies, thus allowing the implicated codefendant to cross-examine him. *State v. Craig*, 82 Wn.2d 777, 788, 514 P.2d 151 (1973).

¶34 Here, Johnson's statements were introduced through his testimony, not a confession. It is undisputed that Odell and Balaski had the opportunity to cross-examine Johnson. Thus, the joint trial did not deprive them of the right to confrontation and severance was not warranted on this basis.[7] We affirm the trial court's denial of the motions to sever.

¶35 A majority of the panel having determined that only a portion of this opinion will be printed in the Washington Appellate Reports, the remainder will be filed for public record pursuant to RCW 2.06.040, it is so ordered.

BRIDGEWATER and ARMSTRONG, JJ., concur.

Review denied at 165 Wn.2d 1050 (2009).

---

[7] Odell also cites to out-of-state cases that predate *Bruton*. Additionally, Odell argues that *Canedo-Astorga*'s standards two and four also warrant reversal. But the evidence here was not " 'almost impossible' " to separate for each defendant, and there was not a " 'gross disparity in the weight of the evidence against the defendants' " simply because, as Odell suggests, he did not have mud, blood, or gunpowder on his clothing while the other defendants did. *Canedo-Astorga*, 79 Wn. App. at 528 (quoting *Oglesby*, 764 F.2d at 1276). It was undisputed that Odell stayed in the Tahoe; the jury could understand this distinction in physical evidence.