**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

BY _____
DEPUTY

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42425-8-II |
| Respondent, | |
| v. | |
| MICHAEL AUSTIN KERBY, | Consolidated with |
| Appellant. | |
| STATE OF WASHINGTON, | No. 42428-2-II |
| Respondent, | |
| v. | |
| JEFFREY ALLEN STRICKLAND | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — A jury found Michael Austin Kerby and Jeffrey Allen Strickland guilty of two counts of first degree assault while armed with a firearm. Both Kerby and Strickland raise numerous issues in their appeals. In Strickland's case, the trial court erred by admitting Kerby's statement to the police without a limiting instruction. Therefore, we reverse Strickland's conviction and remand for proceedings consistent with this opinion. The trial court did not commit reversible error in Kerby's case, and we affirm Kerby's conviction.

FACTS

Daniel Ivy and Eugene Savage were having drinks at Mac's Cigar and Tavern. At some point in the evening, Savage went outside to smoke. Kerby and Strickland were already outside

smoking. Savage made a passing comment to Kerby and Strickland in Spanish. Kerby and Strickland took offense to being spoken to in Spanish and confronted Savage about the perceived disrespect. The confrontation between Kerby, Strickland, and Savage began to escalate. Ivy noticed the confrontation from inside and went outside to try to intervene and calm the situation. At first, it appeared that the situation was resolved, but then the conflict began to escalate again. During the conflict, Ivy was shot in the chest and Savage was shot in the leg. Kerby and Strickland fled from the scene, but were later apprehended by law enforcement.

The State charged both Kerby and Strickland with two counts of first degree assault while armed with a firearm. On April 4, 2011, the trial court heard several pretrial motions, including the State's motion to continue the trials and to join Kerby's and Strickland's cases for trial. The State moved to continue the trials in order to finish forensic testing on bullets and shell casings found at the scene of the shooting. The State told the court that the evidence was currently with the fingerprint lab, and that the fingerprint testing should be completed in a few days. However, the evidence would then need to be sent to another lab for deoxyribonucleic acid (DNA) testing which would take approximately 60 days from the time the DNA lab received the evidence. Both Kerby and Strickland objected to continuing their trials. The trial court stated that the evidence found from forensic testing had the potential to benefit either party, and therefore, there was good cause to continue the trial until the forensic testing could be completed. The trial court entered an order continuing the trial date "for good cause to allow completion of laboratory testing." Suppl. Clerk's Papers (CP) (Dec. 6, 2011) at 35.

The trial court also heard the State's motion for joinder. Strickland objected to the joinder because the State was going to introduce statements that Kerby made to the police after his arrest.[1] The State conceded that if the trials were joined he could not introduce any of Kerby's statements that implicated Strickland. However, the State presented a redacted copy of Kerby's statement which it argued eliminated any mention of Strickland and, therefore, did not prevent joint trials. The trial court agreed and granted the State's motion for joinder.

On June 13, 2011, Kerby wrote a letter to the trial court, stating he wanted the trial court to do one of three things: (1) dismiss the case, (2) allow Kerby to proceed pro se, or (3) replace his current counsel with specific counsel. Kerby listed four grounds supporting his request:

1. (no objections) except to my right to speedy trial in 3 strikes case.
2. Since I've been graciously given 2 lawyers, they have only been to court 2 times together and 4 or 5 times just one.
3. My trial date was suppose [sic] to be June 2nd but my attorney had 5 days vacation. WOW.
   Well my life is worth more than a 5 day vacation.
4. I find it mysteriously odd that the PA knows our or my every move when we get to court. OH. Because Ted DeBray is hoping to work 4 [sic] PA. Makes sense now.

Suppl. CP (Dec. 7, 2012) at 89. Kerby also stated that until the trial court granted one of his three requests he would no longer attend court.

The trial court responded with a letter stating:

I have reviewed your correspondence presented to the court on June 13, 2011. It appears you have three issues you believe need to be heard by the court. Specifically:
   A. You are concerned regarding representation by your present attorneys;

---

[1] The trial court held a CrR 3.5 hearing and found that Kerby's statements were made after a knowing and voluntary waiver of his Miranda rights.

B. You are requesting appointment of different counsel or in the alternative to represent yourself;

C. You indicate that you will not be appearing in further court hearings.

I am placing your correspondence in the court file. Copies are being sent to your attorneys and to the prosecuting attorney as I am required to do.

The issues you raise in your correspondence will be addressed at hearing on Friday, June 17, 2011, at 8:30 A.M. Your attendance will be required.

Suppl. CP (Dec. 7, 2011) at 95. At the June 17 hearing, the trial court allowed Kerby to speak on the record regarding his attorneys. Kerby stated:

I am ready for trial, and I would like to dismiss DeBray, keep Hatch and Keehan, for all the reasons I mentioned in there. For me, it was, I haven't seen anybody since I have had two lawyers. They have been to court twice in three months together. That's crazy. He comes back, he leaves for ten days. I don't know what's going on. You know, and out of respect for him and Keehan, for him telling me that he is still on vacation, still doing work, that's good enough for me. But, you know, for me not to hear anything. And, you know, everything that is done in this case, I did. If I didn't have any law books, I would be sitting doing life right now. That's a fact. You know, but I have to fight for myself and fight for my co-defendant, because it's crazy. That's all. I just wish that you would let—keep him, I just don't see any reason for me to put my life in someone—I don't trust looking at life in prison.

1 Report of Proceedings at 9.

The trial court responded that Kerby had been appointed good lawyers and it did not matter whether Kerby liked them because they were doing a good job. The trial court concluded by stating, "Rule number two, replacement of counsel and anything of that nature, no, denied." 1 RP at 13-14.

The jury trial began on June 28, 2011. After the jury voir dire was conducted, the attorneys, the defendants, and the trial court conducted a side bar to select a jury. After the side bar the trial court made the following record:

The record will reflect, that approximately, 12:05, the lawyers and Mr. Strickland and Mr. Kerby and I stepped to the table and a side bar to select the jury. We spent approximately 20 to 25 minutes doing that. Every one [sic] was given the opportunity to exercise their challenges, and for all intents and purposes as making a record of the side bar, that's what took place.

1 RP at 24.

At trial, Ivy testified about the events leading up to the shooting. Ivy saw Savage talking to Strickland and Kerby and believed they were in some type of confrontation. Ivy left the bar to check on the situation. When he got outside he learned that Strickland and Kerby felt disrespected because Savage had spoken to them in Spanish. Ivy attempted to calm the situation down, but Strickland and Kerby began saying that it needed to be dealt with away from the bar. Ivy attempted to leave with Savage, and he believed that he had gotten the situation calmed down. However, the situation began escalating again when Kerby encouraged Strickland to deal with being disrespected. Ivy walked to the car, realized that Savage was not with him, and went back to get him. At that point, Ivy saw Strickland raise his arm up and saw the muzzle of the weapon. Ivy heard a "click" followed by a "bang" and realized he had been shot in the chest. 1 RP at 99. Ivy went back into the bar and asked for help.

Ivy admitted that before the altercation he had consumed approximately seven to eight beers. He did not know either Strickland or Kerby before the incident so he identified the shooter as the shorter of the two people and wearing a black "pouffy" jacket. 1 RP at 98. Ivy also testified that the woman who was with Strickland and Kerby (later identified as Jerri Chrisman) said "just shoot his ass." 2 RP at 134. In addition, Ivy was adamant that nobody had

a stun gun or got stunned. Finally, Ivy admitted that he could not identify Strickland as the shooter when he originally spoke to the police.

Savage also testified. He remembered going to Mac's, but he admitted that he had "a fair amount to drink." 1 RP at 35. Savage also admitted that he had a limited memory about what happened on the night he was shot because he was highly intoxicated. He testified that he remembered going outside to smoke and saying something innocuous in Spanish. The next thing he remembered was Ivy getting shot and he saw a muzzle flash coming from Strickland. After Ivy was shot, Savage was shot in the leg. Savage also testified that Strickland did not have a coat on when they were outside. Savage was also adamant that there was no stun gun involved in the altercation. Savage did not identify Strickland as the shooter in his original statement, and he never saw Kerby with a gun.

Chrisman, Kerby's girlfriend at the time, testified about her recollection of the day of the shooting. On the night of the shooting, Chrisman picked Kerby up at the bowling alley. Kerby had a stun gun with him at the bowling alley. Before going to Mac's, Chrisman and Kerby stopped at Chrisman's house. Chrisman thought she saw Kerby wrap a gun in a towel and bring it with him. Chrisman and Kerby picked up Strickland and the three of them went to Mac's. Kerby and Strickland went outside and Chrisman followed them. Chrisman saw Savage and another man wearing a cowboy hat outside the bar. Chrisman heard one of the men speak to Strickland in Spanish and then Kerby got angry about Strickland being disrespected. The confrontation began to escalate, and Chrisman testified that Kerby stunned Savage. Chrisman believed that she heard Kerby say "he was going to shoot the mother f******" and pull out a

6

gun. 2 RP at 366. Chrisman ran from the parking lot of Mac's, and law enforcement later contacted her at the nearby Jack in the Box.

Chrisman gave several statements to law enforcement over the course of the investigation. In her first statement, she did not say anything about Kerby having a firearm. In a later statement, Chrisman told the defense investigator that she could not say who did the shooting because she did not actually see it. On cross-examination, Chrisman's account of the events of the shooting was unclear and contradictory. For example, at one point she stated she thought Kerby had the stun gun in one hand and the pistol in the other, although she was not sure. She also admitted that she has "a tendency to black things out, black them out and make them try to go away." 3 RP at 446.

The State introduced several pieces of evidence obtained from the crime scene. One full bullet and two spent shell casings were recovered from the parking lot outside of Mac's. The bullet and shell casings were tested for DNA. The lab was able to obtain a partial DNA profile. Although the partial profile was insufficient to perform an identification, the lab technician testified that the partial profile excluded both Kerby and Strickland. Law enforcement never recovered the gun used in the shooting.

Aberdeen Police Detective Sergeant Arthur Laur interviewed Kerby after his arrest and testified about the statements Kerby made during the interview.[2] At first, Kerby stated that he never saw or touched a gun. Later, Kerby said that he had a gun, but he never pulled the trigger;

---

[2] The State introduced Kerby's statements through Laur's testimony. Laur's testimony was based on, and consistent with, the redactions that the State presented during the pretrial motions.

7

he got rid of the gun. Then, Kerby changed his story and stated that he never saw a gun but if there was a gun, he got rid of it and did not shoot anybody.

Strickland testified in his own defense. According to Strickland, Savage was the one who attempted to start the confrontation. Neither Kerby nor Strickland thought it was significant and attempted to ignore him. By the time Ivy came outside, Strickland believed that the situation was resolved. Then Strickland left and began walking toward a store about half a block away. As Strickland was walking away, he heard gunshots and began to run away. Strickland testified that he did not have a gun, and he never shot anyone. Strickland also testified that he was not wearing a black pouffy jacket.[3]

The trial court instructed the jury on both principal and accomplice liability for both Strickland and Kerby. The trial court did not give a limiting instruction regarding the use of Kerby's statements. Kerby also requested an instruction regarding accomplice testimony based on the theory that Chrisman acted as an accomplice and the jury should be cautioned on the use of her testimony.[4] The trial court refused to give Kerby's proposed instruction on accomplice testimony because it did not believe the facts of the case warranted a cautionary instruction.

---

[3] The black pouffy jacket was a size triple XL. Strickland was 5'6" and weighed 160 pounds. Apparently, at trial, Strickland tried the jacket on to demonstrate that it did not fit him.

[4] Kerby's proposed instruction was WPIC 6.05 which reads,
> Testimony of an accomplice, given on behalf of the State, should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find the defendant guilty upon such testimony alone unless, after carefully considering the testimony, you are satisfied beyond a reasonable doubt of its truth.

Suppl. CP (Oct. 26, 2011) at 27 (quoting 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.05, at 184-85 (3rd ed., 2008)).

8

During deliberations the jury sent the trial court a question which read,

On the form regarding who was armed – It seems as if, the way in which the statement is written, it doesn't matter who was armed with a firearm (i.e.) "was [Kerby], or an accomplice armed . . ."

LIKEWISE

"was [Strickland], or an accomplice, armed with a firearm . . ."

Are we correct to interpret these statements as if it is not pertinent who has the gun?

Suppl. CP (Oct. 27, 2011) at 62. The trial court responded. "Pursuant to your note of inquiry regarding the special verdict form. You must be guided by the instructions given to you by the court." Suppl. CP (Oct. 27, 2011) at 61. The jury returned verdicts finding both Strickland and Kerby guilty of two counts of first degree assault while armed with a firearm. Kerby and Strickland timely appeal.

ANALYSIS

Strickland and Kerby each raise numerous issues. However, with the exception of the public trial issue, their issues are separate and distinct. Because it requires reversal, we first address Strickland's claim that the trial court erred by admitting Kerby's statement to the police without a limiting instruction. We also address the following issues raised by Strickland: (1) whether the trial court violated the time for trial rules, (2) whether the accomplice liability statute is unconstitutionally overbroad, and (3) whether sufficient evidence supports the jury's verdict because these issues raise double jeopardy concerns. Because we reverse on the trial court's failure to give a limiting instruction regarding Kerby's statements, it is unnecessary for us to address Strickland's issues that do not raise double jeopardy concerns or that may arise on retrial.

Kerby raises three issues: (1) whether the trial court violated his right to proceed pro se, (2) whether the trial court erred by denying Kerby's request for a cautionary instruction on accomplice testimony, and (3) whether the trial court violated Kerby's and Strickland's public trial right. Kerby also raises claims of ineffective assistance of counsel and prosecutorial misconduct in his Statement of Additional Grounds (SAG).[5] Kerby has not identified any reversible error.

A. STRICKLAND'S CLAIMS

1. Confrontation Clause Violation

Strickland claims that the trial court erred by admitting Kerby's statement to the police. Although the trial court's redaction of Kerby's statement complies with the requirements set out in *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), and *Richardson v. Marsh*, 481 U.S. 200, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987), the trial court violated Strickland's right to confrontation by failing to give the jury a proper limiting instruction.

We review a claim that the trial court violated the defendant's right to confrontation by admitting a codefendant's statement de novo. *State v. Larry*, 108 Wn. App. 894, 901-02, 34 P.3d 241 (2001) (citing *United States v. Mayfield*, 189 F.3d 895, 899 (9th Cir. 1999); *United States v. Hoac*, 990 F.2d 1099, 1105 (9th Cir. 1993)). In *Bruton*, the United States Supreme Court established that a defendant is "'deprived of his confrontation rights under the Sixth Amendment when he [is] incriminated by a pretrial statement of a codefendant who did not take the stand at

---

[5] RAP 10.10.

10

trial.'" *Larry*, 108 Wn. App. at 902 (quoting *State v. Hoffman*, 116 Wn.2d 51, 75, 804 P.2d 577 (1991)). However, the confrontation clause is not violated if the statement can be redacted so that it is no longer incriminating on its face. *Richardson*, 481 U.S. at 208.

In *Richardson*, Richardson and two other defendants were convicted of assault and murder. 481 U.S. at 205. The State introduced a codefendant's confession that omitted any indication that Richardson participated in the crime. *Richardson*, 481 U.S. at 203. However, the confession included a conversation that took place in a car between the codefendant and the third participant (who was a fugitive at the time of trial) in which they decided they would have to kill the victims after the robbery. *Richardson*, 481 U.S. at 204. Later, Richardson took the stand and testified that she was in the car with the two other participants, although she alleged she did not hear any conversation about killing the victims of the robbery. *Richardson*, 481 U.S. at 204. On appeal, Richardson argued that the codefendant's statement violated her right to confrontation because it incriminated her by establishing that she participated in the robbery knowing that the other participants premeditated killing the victims. *Richardson*, 481 U.S. at 205-06. The United States Supreme Court disagreed and held that because the statement did not incriminate Richardson unless other evidence placed her in the car, introducing the statement did not violate the confrontation clause. *Richardson*, 481 U.S. at 206.

In *Larry*, we reached the same conclusion as the Supreme Court in *Richardson*. 108 Wn. App. at 907-08. Larry and his codefendant Varnes, kidnapped the victim at gunpoint, drove with him in the car, and ultimately shot him several times. 108 Wn. App. at 899-902. Varnes's confession was redacted and introduced at trial. *Larry*, 108 Wn. App. at 905-06. Although the

11

confession was redacted to eliminate any direct reference to Larry, it contained references to another person including specific references to the car's driver. *Larry*, 108 Wn. App. 906. Based on the evidence presented at trial, the jury could infer that Larry was the driver or one of the other people referred to in the statement. *Larry*, 108 Wn. App. at 906. We held that although the jury could infer that the statement referred to Larry as one of the participants in the crime, it complied with the requirements of *Bruton*. *Larry*, 108 Wn. App. at 907.

Here, the redacted statements admitted at trial complied with the rules established in *Richardson* and *Larry*. Kerby's statements reference what he did not do, i.e., fire the gun, possess the gun, or shoot anyone. Strickland argues that Kerby's statement directly incriminates him because he was the other person at the scene, thus if Kerby did not shoot the gun, Strickland must have. This is the same argument that was rejected in *Richardson* and *Larry*. Kerby's statement incriminates Strickland because other evidence, including his own testimony, establishes that he was the other person with Kerby outside the bar, the statement is not incriminating on its face. Therefore, the statement was redacted consistent with the requirements of *Richardson* and *Larry*.

In *Richardson* and *Larry*, however, the redaction cured any confrontation clause violation because the trial court explicitly instructed the jury that the statements could not be considered evidence against the codefendants. 481 U.S. at 207; 108 Wn. App. at 905. Without an appropriate limiting instruction, the jury is free to consider testimonial hearsay as evidence against the defendant which is a violation of the confrontation clause, regardless of whether the

statement directly incriminates the defendant. *See Richardson*, 481 U.S. at 206-07. In *Richardson*, the Supreme Court explicitly stated,

> We hold that the Confrontation Clause is not violated by the admission of a non-testifying codefendant's confession *with a proper limiting instruction* when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence.

481 U.S. at 211 (emphasis added). Here, the trial court failed to instruct the jury that Kerby's statement could not be considered evidence against Strickland. Without an explicit instruction prohibiting the jury from considering Kerby's statement as evidence against Strickland, admission of the statement, even properly redacted, violated the confrontation clause.

Further, the error was not harmless. Violations of the confrontation clause are subject to harmless error analysis. *State v. Davis*, 154 Wn.2d 291, 304, 111 P.3d 844 (2005), *aff'd*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). When determining whether a constitutional error is harmless, we apply the overwhelming untainted evidence test. *Davis*, 154 Wn.2d at 305. "Under that test, where the untainted evidence admitted is so overwhelming as to necessarily lead to a finding of guilt, the error is harmless." *Davis*, 154 Wn.2d at 305. Here, Ivy testified that Strickland was the person who shot him. However, Ivy never actually saw Strickland with the gun. There was no evidence at trial that Strickland ever possessed the gun, and Savage was not sure who shot him. Strickland denied possessing a gun or participating in the shooting, and he testified that he was already leaving the scene at the time the shooting took place. Accordingly, there was not overwhelming, untainted evidence proving that Strickland was the shooter or participated in the shooting, and we reverse his conviction.

2. Time for Trial

Strickland argues that the trial court violated the time for trial rules by granting the State's motion for a continuance over his objection. Although the trial court's error violating Strickland's right to confrontation is dispositive and requires reversal, we must address the alleged time for trial error because such an error would require dismissal with prejudice. The trial court did not abuse its discretion by granting the State's motion to continue and, thus, did not violate the time for trial rules.

Under CrR 3.3(b)(2), a defendant not detained in jail is required to be brought to trial within 90 days of his arraignment date. However, CrR 3.3(f)(2) allows the trial court to continue the trial date "when such continuance is required in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense." The decision whether to grant or deny a motion to continue lies within the sound discretion of the trial court and will not be disturbed absent a showing of manifest abuse of discretion. *State v. Woods*, 143 Wn.2d 561, 579, 23 P.3d 1046 (2001). "A continuance granted by the trial court is an abuse of discretion only if it can be said that the decision was 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *Woods*, 143 Wn.2d at 579 (quoting *In re Det. of Schuoler*, 106 Wn.2d 500, 512, 723 P.2d 1103 (1986)) (internal quotations omitted).

Strickland appears to rely in large part on the fact that the trial court's written order which granted the trial continuance "for good cause to allow completion of laboratory testing," does not contain explicit findings of fact on which the trial court relied when making its decision. However, we can supplement written findings and orders with the trial court's oral decision

provided that the trial court's oral decision does not conflict with the written order. *State v. Hinds*, 85 Wn. App. 474, 486, 936 P.2d 1135 (1997). Furthermore, CrR 3.3 does not require the trial court to enter written findings of fact or conclusions of law. *Compare* CrR 3.3 with CrR 3.5. Even when a court rule requires written findings of fact and conclusions of law, the trial court's failure to enter written findings of fact and conclusions is not a fatal error provided that the record is sufficient to allow us to review the alleged error. *State v. Miller*, 92 Wn. App. 693, 703, 964 P.2d 1196 (1998), *review denied*, 137 Wn.2d 1023 (1999). Here, the record is sufficient to allow us to determine whether the trial court abused its discretion when it granted the State's motion to continue.

Strickland also argues that CrR 3.3 must be strictly construed and, therefore, the trial court erred by failing to make specific findings that (1) the continuance was required in the administration of justice and (2) that the defendant would not be prejudiced by the continuance. Strickland's argument is not persuasive. Strickland cites *State v. Kenyon*, 167 Wn.2d 130, 136, 216 P.3d 1024 (2009), for the proposition that CrR 3.3 must be strictly construed. However, nothing in *Kenyon* stands for the proposition that it is reversible error for the trial court to fail to make specific findings regarding the exact language within the rule. Strickland has cited no authority that requires the trial court to make specific findings, and we have found none. Instead, the appropriate question is whether the trial court abused its discretion by granting the State's motion for a continuance. *See Woods*, 143 Wn.2d at 579.

Strickland further argues that the trial court abused its discretion because it failed to make an adequate inquiry into (1) why the casings were not sent for forensic testing until two weeks

after they were collected, (2) the procedures used by the laboratories "to determine whether the labs do everything possible to ensure that tests are performed in a timely way," and (3) the likelihood that the tests would produce material evidence. Br. of Appellant (Strickland) at 20. Although this information may have been helpful to the trial court, this level of inquiry is not necessary to determine whether the trial court's decision was manifestly unreasonable.

Here, the State moved for a continuance to determine whether fingerprint or DNA evidence could be recovered from the shell casings found at the scene of the shooting. Obviously, if Kerby's or Strickland's fingerprints or DNA had been found on the shell casings it would be material evidence and this was clearly the State's goal in obtaining forensic testing. In addition, the State had spoken to both lab technicians and was able to give the court specific time frames for the forensic testing to be completed. It was not manifestly unreasonable for the trial court to grant the State's motion for a continuance to obtain potentially material evidence, especially when the State was able to provide a specific time frame in which the forensic testing would be completed. Therefore, the trial court did not abuse its discretion, and it did not violate the time for trial rules by granting the State's motion for a continuance.

3. Constitutionality of Accomplice Liability

Strickland argues that the accomplice liability statute is unconstitutionally overbroad because it impermissibly penalizes free speech in violation of the First and Fourteenth Amendment. We address Strickland's challenge to the constitutionality of the accomplice liability instruction because a charge based on an unconstitutional statute requires dismissal. However, Strickland's argument has already been addressed and rejected by Washington courts.

In *State v. Coleman*, 155 Wn. App. 951, 960-61, 231 P.3d 212 (2010), *review denied*, 170 Wn.2d 1016 (2011), Division One of this court rejected the argument that the accomplice liability statute was impermissibly overbroad because the accomplice liability statute "requires the criminal mens rea to aid or agree to aid the commission of a specific crime with knowledge the aid will further the crime. . . [The statute's] sweep avoids protected speech activities that are not performed in aid of a crime and that only consequentially further the crime." In *State v. Ferguson*, 164 Wn. App. 370, 376, 264 P.3d 575 (2011), *review denied*, 173 Wn.2d 1035 (2012), we explicitly adopted Division One's reasoning and held that the accomplice liability statute is not unconstitutionally overbroad. *Coleman* and *Ferguson* are controlling. The accomplice liability statute is not unconstitutionally overbroad. Accordingly, Strickland's claim fails.

4. Accomplice Liability Jury Instruction

Strickland argues that there is insufficient evidence to support the jury's guilty verdict. Strickland concedes that there is sufficient evidence to support the jury's verdict finding him guilty as a principle, and therefore, there is sufficient evidence to support the jury's verdict. However, Strickland contends that there was insufficient evidence to support the jury's verdict finding him guilty under a theory of accomplice liability. Although Strickland alleges that this is an issue of sufficiency of the evidence, it is not. Rather, Strickland actually argues that the trial court erred by instructing the jury on accomplice liability. Accordingly, it will be addressed as such.

We review challenged jury instructions de novo. *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006). Jury instructions are sufficient when, read as a whole, they accurately state

17

the law, do not mislead the jury, and permit each party to argue its theory of the case. *State v. Teal*, 152 Wn.2d 333, 339, 96 P.3d 974 (2004). Under RCW 9A.08.020(3)(a), a person acts as an accomplice if, with knowledge that it will promote or facilitate the commission of a crime, he solicits, commands, encourages, or requests a person to commit a crime, or he aids or agrees to aid such other person in planning or committing a crime. Here, the jury instructions properly stated the law establishing accomplice liability. The jury instruction also allowed both sides to argue their theories of the crime. The State argued that Strickland created the confrontation between the parties and escalated the confrontation to the point that a shooting occurred. Strickland was able to argue that he had abandoned the confrontation and was leaving the scene; therefore, he was merely present at the scene of the crime. Here, the accomplice jury instruction was legally correct and the trial court did not err by instructing the jury on both principle and accomplice liability.

Although the trial court did not violate the time for trial rules, the accomplice liability statute is constitutional, and the trial court did not err in giving an accomplice liability jury instruction, the trial court did improperly admit Kerby's statement without a proper limiting instruction. Therefore, Strickland's convictions are reversed, and his case is remanded for further proceedings consistent with this opinion.

B. KERBY'S CLAIMS

1. Kerby's Request to Proceed Pro Se

Kerby argues that the trial court erred by summarily denying his motion to proceed pro se. The State responds that because Kerby's request was either equivocal or abandoned, the trial

18

court did not err by refusing to allow Kerby to proceed pro se. At the hearing addressing this issue, Kerby had the opportunity to articulate his request to proceed pro se, but he did not. There are identifiable facts in the record that convince us Kerby's request to proceed pro se was equivocal. Therefore, we affirm the trial court's decision denying Kerby's request to proceed pro se.

Criminal defendants have an explicit right to self-representation under both the Sixth Amendment of the United States Constitution and article I, section 22 of the Washington Constitution. "This right is so fundamental that it is afforded despite its potentially detrimental impact on both the defendant and the administration of justice." *State v. Madsen*, 168 Wn.2d 496, 503, 229 P.3d 714 (2010) (citing *Faretta v. California*, 422 U.S. 806, 834, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)). "The unjustified denial of this [pro se] right requires reversal." *State v. Stenson*, 132 Wn.2d 668, 737, 940 P.2d 1239 (1997) (citing *State v. Breedlove*, 79 Wn. App. 101, 111, 900 P.2d 586 (1995)).

We review the trial court's decision denying a defendant's right to proceed pro se for an abuse of discretion. *Madsen*, 168 Wn.2d at 504. After a defendant has made a request to proceed pro se, the trial court must first determine whether the request is unequivocal and timely. *Madsen*, 168 Wn.2d at 504 (citing *Stenson*, 132 Wn.2d at 737). If the defendant's request is unequivocal and timely, "the court must then determine if the defendant's request is voluntary, knowing, and intelligent, usually by colloquy." *Madsen*, 168 Wn.2d at 504 (citing *Faretta*, 422 U.S. at 835). Courts are required to indulge in every reasonable presumption against a defendant's waiver of the right to counsel. *Madsen*, 168 Wn.2d at 504 (quoting *In re Det. of*

*Turay*, 139 Wn.2d 379, 396, 986 P.2d 790 (1999)). However, in *Madsen*, Division One of this court stated,

> This presumption does not give a court carte blanche to deny a motion to proceed pro se. The grounds that allow a court to deny a defendant the right to self-representation are limited to a finding that the defendant's request is equivocal, untimely, involuntary or made without a general understanding of the consequences. Such a finding must be based on some identifiable fact; the presumption in *Turay* does not go so far as to eliminate the need for any basis for denying a motion for pro se status.

*Madsen*, 168 Wn.2d at 504-05.

Here, Kerby wrote a letter to the court stating that he wanted the court to replace his current counsel with specific counsel or allow him to represent himself. At the hearing on this issue, Kerby spoke to the court about his request. Kerby specifically requested to keep two attorneys, but asked that the third be dismissed. Kerby was silent as to his prior written request to the court except for his specific statements as to which counsel he wanted dismissed.

Given this record, Kerby's request to proceed pro se was equivocal. In *Stenson*, the defendant made a motion to substitute counsel because of his dissatisfaction with his current counsel's performance. 132 Wn.2d at 734-35. When the trial court denied his motion to substitute counsel, Stenson made a motion to proceed pro se. *Stenson*, 132 Wn.2d at 739. Stenson told the court that he wanted to proceed pro se because he did not want to go to trial with the counsel that he had appointed. *Stenson*, 132 Wn.2d at 739-40. Our Supreme Court noted that, "[w]hile a request to proceed pro se as an alternative to substitution of new counsel does not necessarily make the request equivocal . . . such a request may be an indication to the trial court, in light of the whole record, that the request is not unequivocal." *Stenson*, 132 Wn.2d at 740-41

(citing *Hamilton v. Groose*, 28 F.3d 859, 862 (8th Cir. 1994); *Adams v. Carroll*, 875 F.2d 1441, 1445 (9th Cir. 1989); *People v. Williams*, 220 Cal. App. 3d 1165, 269 Cal. Rptr. 705, 707-08 (1990)). Such is the case here.

Although Kerby made a request to proceed pro se, the request was an alternative to obtaining substitute counsel. Kerby affirmatively agreed to keep two of his attorneys, Hatch and Keehan. As in *Stenson*, almost all of the discussion between Kerby and the trial court, both in his letter and in his oral statement, concerned his request for different counsel rather than his request to represent himself. 132 Wn.2d at 742. Kerby's primary complaints were regarding the attorney's taking vacation and not communicating with him enough. Accordingly, based on the record as a whole, Kerby's request was equivocal, and he was not denied his Sixth Amendment right to counsel.

2. Accomplice Testimony Jury Instruction

Kerby argues that the trial court erred by refusing to give the jury an instruction cautioning them on the use of accomplice testimony. Kerby's argument rests on the assumption that Chrisman was an uncharged accomplice, and therefore, the trial court was required to instruct the jury to treat her testimony with extreme caution. Even assuming that Chrisman was an uncharged accomplice, the facts of this case are such that it was not reversible error for the trial court to fail to give a jury instruction on accomplice testimony because Chrisman's testimony was sufficiently corroborated.

Washington courts have repeatedly expressed concern over the reliability of accomplice testimony. *State v. Harris*, 102 Wn.2d 148, 153, 685 P.2d 584 (1984), *overruled on other*

21

*grounds by State v. Brown*, 113 Wn.2d 520, 782 P.2d 1013 (1989). "A conviction may rest solely upon the uncorroborated testimony of an accomplice *only* if the jury has been sufficiently cautioned by the court to subject the accomplice's testimony to careful examination and to regard it with great care and caution." *State v. Carothers*, 84 Wn.2d 256, 269, 525 P.2d 731 (1974). In *Harris*, our Supreme Court held,

> (1) [I]t is always the better practice for a trial court to give the cautionary instruction whenever accomplice testimony is introduced; (2) failure to give this instruction is always reversible error when the prosecution relies *solely* on accomplice testimony; and (3) whether failure to give this instruction constitutes reversible error when the accomplice testimony is corroborated by independent evidence depends upon the extent of corroboration.

102 Wn.2d at 155. Corroborating evidence is sufficient if it fairly connects the defendant with the crime, and independent evidence is not needed to corroborate every part of the accomplice's testimony. *State v. Calhoun*, 13 Wn. App. 644, 648, 536 P.2d 668 (1975).

Assuming, but not deciding, that Chrisman's testimony would be considered accomplice testimony, it would have been the better practice for the trial court to give the jury a cautionary instruction.[6] However, independent evidence sufficiently connects the defendants with the crime. Therefore, it was not reversible error for the trial court to refuse to instruct the jury to treat Chrisman's testimony with caution. Independent evidence established that Strickland and Kerby were at the bar and that they both engaged in a confrontation with Ivy and Savage. Furthermore, Kerby's own statements corroborate Chrisman's assertion that at one point Kerby

---

[6] Kerby argues that Chrisman was an uncharged accomplice because Ivy testified that he heard the woman who was with Kerby and Strickland yell, "[S]hoot his ass." 2 RP at 134. Taking Ivy's testimony as true, Chrisman encouraged the commission of the crime and could be charged as an accomplice. *See* RCW 9A.08.020.

had a gun. Based on all the other evidence presented at trial, the defendants were connected to the crime without Chrisman's testimony. Therefore, it was not reversible error for the trial court to refuse to give the jury a cautionary instruction on accomplice testimony.

C.     PUBLIC TRIAL RIGHT

Kerby alleges that the trial court violated his right to a public trial by holding portions of jury selection in a side bar. We disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee a defendant the right to a public trial. *State v. Wise*, 176 Wn.2d 1, 9, 288 P.3d 1113 (2012). We review alleged violations of the public trial right de novo. *Wise*, 176 Wn.2d at 9. The threshold determination when addressing an alleged violation of the public trial right is whether the proceeding at issue even implicates the right. *State v. Sublett*, 176 Wn.2d 58, 71, 292 P.3d 715 (2012). In *Sublett*, our Supreme Court adopted a two-part "experience and logic" test to address this issue: (1) whether the place and process historically have been open to the press and general public (experience prong), and (2) whether the public access plays a significant positive role in the functioning of particular process in question (logic prong). 176 Wn.2d at 72-73. Both questions must be answered affirmatively to implicate the public trial right. *Sublett*, 176 Wn.2d at 73.

Kerby argues that the trial court violated his public trial right because the trial court conducted the for-cause and peremptory challenges portion of jury selection during a sidebar conference. Division Three of this court addressed this exact issue in *State v. Love*, 176 Wn. App. 911, 915-16, 309 P.3d 1209 (2013). In *Love*, the court held that neither "prong of the

23

experience and logic test suggests that the exercise of cause or peremptory challenges must take place in public." 176 Wn. App. at 920. The public trial right does not attach to the exercise of challenges during jury selection. *Love*, 176 Wn. App. at 920. Accordingly, the trial court did not violate Kerby's public trial right and Kerby's challenge fails.

D.   KERBY'S SAG

1. Denial of Right to Counsel – Irreconcilable Conflict

Kerby alleges that his right to counsel was violated because he had an irreconcilable conflict with one of his appointed attorneys. Here, the majority of facts Kerby uses to support his allegation are facts outside the record and, thus, we do not consider them. *State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995). Based on the record before us on appeal, there was not an irreconcilable conflict between Kerby and his attorney.

A defendant's Sixth Amendment right to counsel is violated if the relationship between attorney and client completely collapses and the trial court refuses to substitute new counsel. *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 722, 16 P.3d 1 (2001). But there is a difference between a complete collapse of the relationship or irreconcilable differences and a "mere lack of accord." *State v. Cross*, 156 Wn.2d 580, 606, 132 P.3d 80 (citing *Morris v. Slappy*, 461 U.S. 1, 13-14, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983)), *cert. denied*, 549 U.S. 1022 (2006). A complete collapse of the attorney and client relationship can exist when the defendant refuses to cooperate or communicate with his attorney in any way. *In re Stenson*, 142 Wn.2d at 724 (citing *Brown v. Craven*, 424 F.2d 1166 (9th Cir. 1970)). But a complete collapse can also exist when

24

the communications are quarrelsome, derogatory, or threatening. *In re Stenson*, 142 Wn.2d at 724-25.

Based on the record before us on appeal, Kerby cannot establish an irreconcilable conflict. Although Kerby did express dissatisfaction with his attorney, he never alleged a complete inability to communicate with his attorneys. When the trial court gave him an opportunity to discuss the situation with his attorneys, Kerby responded with generalized dissatisfaction with the way his case was progressing, but he never alleged any severe impediments to continuing the attorney client-relationship. Therefore, nothing in the record before us establishes there was a complete breakdown in attorney client relationship or that there was an irreconcilable conflict. *See State v. Varga*, 151 Wn.2d 179, 200-01, 86 P.3d 139 (2004) (defendant's general dissatisfaction and distrust insufficient to warrant substitution of counsel).

2. Ineffective Assistance of Counsel

Kerby makes several allegations of ineffective assistance of counsel. Specifically, he states that counsel was ineffective for (1) failing to object to the admission of Kerby's statement to the police, (2) failing to obtain the cautionary instruction for Chrisman's testimony, (3) failing to sever the trials, and (4) failing present expert testimony. Kerby also alleges that, even if one alleged instance of ineffective assistance of counsel was not prejudicial, he received "cumulative error of ineffective assistance of counsel." SAG at 19. Kerby's ineffective assistance of counsel claims lack merit.

To prevail on an ineffective assistance of counsel claim, Kerby must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct.

25

2052, 80 L. Ed. 2d 674 (1984). Counsel's performance is deficient if it fell below an objective standard of reasonableness. *Stenson*, 132 Wn.2d at 705. Our scrutiny of counsel's performance is highly deferential; we strongly presume reasonableness. *McFarland*, 127 Wn.2d at 335. To establish prejudice, a defendant must show a reasonable probability that the outcome would have differed absent the deficient performance. *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). If an ineffective assistance of counsel claim fails to support a finding of either deficiency or prejudice, it fails. *Strickland*, 466 U.S. at 697.

First, Kerby alleges that counsel was ineffective for failing to object to the admission of his statement to the police. But Kerby's statement was admitted after the trial court held a CrR 3.5 hearing to determine its admissibility. Accordingly, counsel's performance cannot be deficient for failing object to the admission of Kerby's statement.

Second, Kerby alleges that counsel was ineffective for failing to obtain an instruction cautioning the jury about Chrisman's testimony. But defense counsel proposed this instruction. Further, as we explained above, it was not error for the trial court to refuse to give the instruction. Therefore, counsel's performance was not deficient for failing to obtain a cautionary instruction regarding Chrisman's testimony.

Third, Kerby alleges that defense counsel was ineffective for failing to object to the State's motion for joinder and for failing to file a motion to sever the trials. To show ineffective assistance of counsel based on failure to make a motion to sever, Kerby must show that the motion to sever would have been granted. *State v. Standifer*, 48 Wn. App. 121, 125-26, 737 P.2d 1308 (1987). Kerby argues that he and Strickland had mutually antagonistic defenses that

required separate trials. Specifically, Kerby argues that his defense implies the Strickland fired the gun, and Strickland's defense implies that Kerby fired the gun. The record shows that Kerby and Strickland did not have mutually antagonistic defenses sufficient to warrant separate trials. *See State v. Grisby*, 97 Wn.2d 493, 508, 647 P.2d 6 (1982) (in a trial where the sole disagreement was who killed which victim the prejudice by the antagonistic defenses was not sufficient to require separate trials). Therefore, defense counsel's performance was not deficient for failing to make a motion to sever the trials.

Fourth, Kerby alleges that defense counsel was ineffective for failing to obtain and present expert testimony.[7] Generally, whether to call a witness is a matter of legitimate trial tactics and will not support a claim of ineffective assistance of counsel. *State v. Maurice*, 79 Wn. App. 544, 552, 903 P.2d 514 (1995). Failure to provide expert testimony has been held deficient only where the expert was necessary to explain something a lay witness could not. *See Maurice*, 79 Wn. App. at 552; *Thomas*, 109 Wn.2d at 231-32. Kerby's proposed expert, Dr. Loftus, would have testified about the effects of alcohol on eyewitness identification and recall. This expert testimony does not rise to the level of being necessary for Kerby's defense, and defense counsel was not deficient for failing to obtain or present this expert testimony.

Finally, because counsel's performance was not deficient there can be no cumulative prejudice from counsel's ineffectiveness. Kerby has failed to meet his burden to prevail on his ineffective assistance of counsel claims.

---

[7] We also note that Strickland attempted to introduce Dr. Loftus's testimony, but the trial court excluded it.

3. Prosecutorial Misconduct

Kerby alleges that the prosecutor engaged in misconduct by failing to disclose a deal made with Chrisman in exchange for her testimony. This allegation rests on facts outside the record on appeal, and cannot be reviewed on direct appeal. *McFarland*, 127 Wn.2d at 338. Therefore, we do not address Kerby's prosecutorial misconduct claim.

We reverse Strickland's conviction because the trial court erred by failing to give a proper limiting instruction regarding Kerby's statements and remand for further proceedings consistent with this opinion. Kerby has not identified a reversible error. Therefore, we affirm Kerby's conviction.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, P.J.

Penoyar, J.P.T.