# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Matter of the Personal Restraint Petition of<br><br>MICHAEL LOUIS RHEM,<br><br>                         Petitioner. | No. 35195-1-II<br><br><br>UNPUBLISHED OPINION |

JOHANSON, C.J. — Michael Rhem seeks relief from personal restraint imposed following his 2003 jury trial convictions of two counts of first degree assault, each with firearm sentencing enhancements, and one count of first degree unlawful possession of a firearm (UPF). He argues that (1) the trial court violated his public trial right[1] under the Washington State Constitution by excluding his family members and others during jury voir dire and during trial without first

---

[1] Rhem mentions the public's public trial right under art. I, § 10 of the Washington State Constitution in his original personal restraint petition, but he does not analyze whether he may assert the public's right and his argument's focus is on his own public trial rights under art. I, § 22. Accordingly, we address only Rhem's rights under art. I, § 22. *See In re Pers. Restraint of Coggin*, 182 Wn.2d 115, 116 n.3, 340 P.3d 810 (2014) (plurality opinion) (limiting analysis to petitioner's public trial right when petitioner fails to fully analyze public's right).

considering the *Bone-Club*[2] factors,[3] (2) the trial court's orders in limine were violated several times when witnesses and counsel referred to Rhem's possession of a firearm not involved in the current offenses and to his first jury trial, and (3) the admission of his co-defendant's statements were improper under *Bruton*.[4] In an amended petition, he raises several sentencing issues and argues that imposing the firearm enhancements on the assaults constitutes double jeopardy because the use of a firearm was an element of the assaults. Respondent argues that we should remand for the trial court to correct certain scrivener's errors on Rhem's judgment and sentence. We deny Rhem's personal restraint petition (PRP) and deny Respondent's request to remand for correction of the judgment and sentence.

## FACTS

### I. BACKGROUND FACTS

The two first degree assaults and the UPF conviction arose out of an alleged retaliatory gang-related shooting that took place in an alley behind Ash Street in Tacoma on August 21, 1999. *State v. Wynn*, noted at 126 Wn. App. 1008, 2005 WL 470049, at *1-2; *State v. Rhem*, noted at 112 Wn. App. 1034, 2002 WL 1481272, at *1. The two assault victims were Michael Rollins and Kimberly Matthews.

Based on the Ash Street shooting, the State charged Rhem and Kimothy Wynn each with two counts of first degree assault and one count of drive-by shooting. *Rhem*, 2002 WL 1481272,

---

[2] *State v. Bone-Club*, 128 Wn.2d 254, 258-59, 906 P.2d 325 (1995).

[3] Rhem does not argue that he received ineffective assistance of appellate counsel because his appellate counsel failed to raise this issue.

[4] *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).

at *1. It also charged Rhem with two counts of first degree UPF and three additional counts of first degree assault based on the events that preceded the Ash Street shooting. *Rhem*, 2002 WL 1481272, at *1.

The State's theory was that the Ash Street shooting was among a string of shootings that were in retaliation for Rollins's failure to assist Rhem and Digno DeJesus, both Crip gang members, during a fight with Rodney Hebert and Chris Meza, both Blood gang members, that occurred in late July 1999. According to the State, after the July incident, on the afternoon of August 21, Hebert and Rollins were driving near South 23rd and Wilkeson Streets when Rhem shot at Hebert's car. Randall Henderson, who was also a Crip, and DeJesus stated that Rhem told them he had done the Wilkeson Street shooting.

At about 9:25 PM that same night, several shots were fired into a crowd attending a barbecue at Wynn's aunt's house; Wynn and Rhem were among the barbecue attendees. The Ash Street shooting then occurred at about 11:15 PM. A few hours later, Rhem and Wynn were injured in another shooting at a local gas station. The State also asserted that Rhem and Wynn shot at Larry Glover's home on September 28.

## II. FIRST TRIAL AND FIRST APPEAL

Rhem pleaded guilty to one of the first degree UPF charges.[5] Rhem and Wynn went to trial on the remaining charges. *Rhem*, 2002 WL 1481272, at *2.

---

[5] This charge stemmed from Rhem's possession of a firearm at the time of his arrest.

In July 2000, a jury convicted Rhem and Wynn each of two counts of first degree assault and one count of first degree UPF.[6] *Rhem*, 2002 WL 1481272, at *1. We reversed these convictions and remanded for further proceedings. *Rhem*, 2002 WL 1481272, at *1. We affirmed the UPF conviction to which Rhem had pleaded guilty. *Rhem*, 2002 WL 1481272, at *11.

During the first trial, the defendants had moved to exclude any references to the fact they were known to always carry guns. *Rhem*, 2002 WL 1481272, at *6. Citing ER 404(b) and ER 406, the trial court admitted testimony from DeJesus and Henderson that they had seen the defendants with "'a gun on a regular basis.'" *Rhem*, 2002 WL 1481272, at *6.

On appeal, we characterized this evidence as "evidence of habit" and held that admission of this evidence was harmful error.[7] *Rhem*, 2002 WL 1481272, at *7-8. We did not consider whether evidence of individual instances of firearm possession would be admissible.

### III. SECOND TRIAL AND SECOND APPEAL

On remand, the State recharged Rhem and Wynn each with two counts of first degree assault with firearm sentencing enhancements and one count of first degree UPF. *Wynn*, 2005 WL 470049, at *2. The case proceeded to a joint jury trial in January 2003.

#### A. VOIR DIRE/EXCLUSION OF FAMILY AND OTHERS

During some of the preliminary hearings, the State moved to exclude any children from the courtroom. Acknowledging that it was an open courtroom, the trial court denied the motion.

---

[6] The jury acquitted Rhem and Wynn of the drive-by shooting charge and acquitted Rhem of the three additional first degree assaults. *Rhem*, 2002 WL 1481272, at *2.

[7] We also held that the accomplice liability and the UPF to-convict instructions were defective and that these errors were not harmless. *Rhem*, 2002 WL 1481272, at *1.

2 Report of Proceedings (RP) at 74.[8] But the court also spontaneously announced that when jury selection started and the jury panel arrived, the courtroom would be too crowded so the courtroom would be "available only for jurors." 2 RP at 75. The trial court specifically stated that the defendant's "family members" would have to "wait outside" until some of the potential jurors were dismissed. 2 RP at 75.

The full jury voir dire has not been transcribed and nothing in the record expressly states whether the public was prevented from entering the courtroom during voir dire. But at some point during voir dire, a juror complained about noises or "disturbance[s]" coming from the hallway outside of the courtroom and jail personnel commented that the defendants' families were "waving hi and holding up the baby through the window." 2 RP 151-52. Rhem's and Wynn's counsels told the trial court that they had told the defendants' family members not to return until the next day because the jury would not be impaneled until then. Voir dire continued the next day and was not transcribed. The record does not show whether or when the public or the defendants' families were allowed into the courtroom.

Later, after the testimony had begun, the trial court commented that the door to the courtroom had been posted with a notice that "people aren't to be coming in, except at a normal break." 5 RP at 391. The court then directed the unnamed individuals who had just entered the courtroom to leave and advised them that they were "welcome at the break." 5 RP at 391.

---

[8] All citations to the Report of Proceedings reference the Report of Proceedings filed in Cause No. 29958-5-II.

B. ORDERS IN LIMINE

In a pretrial hearing, over the defendants' objections, the trial court ruled admissible evidence that both defendants had possessed 9 mm and .45 caliber handguns on specific occasions before and after the date of the alleged shooting. *See Wynn*, 2005 WL 470049, at *2. The trial court later clarified that it was excluding references to general firearm possession and to evidence that either defendant had possessed a 10 mm firearm.

The parties and the trial court also discussed how to handle potential references to the previous trial. The trial court stated that both parties were "prohibited from saying what happened in the prior trials" and asked counsel how they wanted to handle any "mention of previous testimony." RP (Jan. 10, 2003) at 45-46. Wynn's counsel stated that he preferred the phrase "[p]revious testimony." RP (Jan. 10, 2003) at 46. The trial court also asked counsel to admonish the witnesses not to say things like "'[w]ell, at the first trial.'" RP (Jan. 10, 2003) at 46.

C. TESTIMONY

Over the course of seven days, the jury heard testimony from 24 witnesses. Throughout the trial, there were numerous references to "earlier proceeding[s]" (4 RP at 342), "prior proceeding[s]" (4 RP at 349; 5 RP at 433; 6 RP at 605-06, 622-23), previously "being in court testifying" (4 RP at 359), "prior" or "previous[ ]" testimony (5 RP at 379, 429, 452; 6 RP at 627, 645), and "prior court hearing[s]" (5 RP at 494) as various witnesses either refreshed their memories or were impeached with transcripts from prior proceedings. But on three occasions, one witness, Henderson, referred to the prior trial. Rhem's counsel also referred to the "last trial" on

two occasions.[9]  5 RP at 500; 6 RP at 609.  And Wynn's counsel mentioned prior testimony "in this case" once.[10]  6 RP at 620.

Also throughout the trial, the jury heard testimony about Rhem and Wynn possessing 9 mm or .45 caliber firearms.  The only testimony referring to Rhem possessing a 10 mm firearm was Henderson's testimony that Rhem had possessed and fired "a Smith & Wesson 10 mm" during the September 1999 incident at Glover's home.[11]  6 RP at 584.

### D.  WYNN'S REDACTED STATEMENT

Well into the trial, Rhem's counsel also argued that Wynn's redacted statement,[12] which he gave to Detective Tom Davidson, violated *Bruton*.  The trial court approved of the redactions.

No transcript of the redacted statement was admitted at trial.  Instead, Detective Davidson testified about Wynn's statement.[13]

---

[9] We describe these references to the prior trial in more detail below.

[10] Much later in the proceedings, after the State had rested, Rhem's counsel argued that the constant references to prior testimony and the references to one or more of the defendants having been "'in custody ever since'" essentially informed the jury that this was a retrial and that the defendants had previously been convicted.  9 RP at 1367.  The trial court rejected this argument.  The trial court commented that the references throughout the trial included references to "all sorts of people hav[ing] been prosecuted for all sorts of tangential things," so the jury would not have "a clue who's been tried before under what circumstances."  9 RP at 1368.

[11] In its closing argument, the State also commented on Henderson's testimony that in the September 1999 shooting at Glover's house, Rhem had possessed and fired a 10 mm firearm.

[12] Rhem's counsel refers to redactions on "discovery page 76, 3 of 8, to the top of page 76."  9 RP at 1139.  That document is not part of our record.

[13] We describe this testimony in more detail below.

### E. VERDICT AND SENTENCE

The jury found Rhem guilty of two counts of first degree assault, each with a firearm sentencing enhancement, and one count of first degree UPF.

At sentencing, the trial court found that Rhem's offender scores were 9 points for the first assault and the UPF conviction; the offender score for Rhem's second assault conviction was zero.[14] The court did not consider any of Rhem's current offenses to be same criminal conduct.

At the sentencing hearing, the trial court announced it was imposing the same sentences that the previous court had imposed. The prior judgment and sentence had imposed the following sentences: (1) 318 months on the first assault conviction, (2) 123 months on the second assault conviction, (3) 116 months on the UPF conviction to which Rhem pleaded guilty, (4) 116 months on the second UPF conviction, and (5) two 60-month firearm sentencing enhancements on the assault convictions. The first court imposed the second first degree assault sentence consecutive to the first assault conviction and imposed the enhancements consecutive to each other and consecutive to the sentences on the underlying assaults. The total confinement imposed was 561 months.

The judgment and sentence from the second trial was the same as from the first trial, except the second judgment and sentence imposed *183* months instead of 123 months on the second assault convictions and did not include any sentencing information on the first degree UPF to which Rhem had pleaded guilty (although the UPF guilty plea conviction was included in Rhem's criminal history).

---

[14] *See* former RCW 9.94A.400(1)(b) (1998).

F. SECOND APPEAL

We affirmed these convictions in an unpublished decision. *Wynn*, 2005 WL 470049, at *1. This appeal mandated on February 9, 2006.

IV. PERSONAL RESTRAINT PETITION AND REFERENCE HEARING

In July 2006, less than a year after the direct appeal mandated, Rhem filed a timely pro se PRP.[15]  In this PRP, he argued that (1) the trial court violated his public trial rights under the Washington State Constitution by excluding his family members and others during jury voir dire and during the trial without first considering the *Bone-Club* factors, (2) the trial court's orders in limine were violated several times when witnesses and the State referred to Rhem's possession of the 10 mm firearm and when witnesses and counsel referred to his first jury trial, and (3) the admission of Wynn's statement was improper under *Bruton*.  In September 2006, also less than a year after the direct appeal mandated, Rhem filed a timely supplemental petition asserting several sentencing errors[16] and a double jeopardy argument.

In a second supplemental PRP, Rhem, who was then represented by counsel, filed sworn statements or declarations from Rhem's trial counsel and Rhem regarding the closed courtroom issue.  Trial counsel's sworn statement stated that (1) the trial court had ordered all members of the public to leave the courtroom when the first group of jurors arrived for the jury selection process, (2) when the jury panel arrived several people, including Rhem's friends and family, were ordered to sit outside the courtroom, (3) even after the full jury panel arrived, there was room in

---

[15] *See* RCW 10.73.090.

[16] We describe these arguments in more detail below.

the courtroom, (4) the trial court never discussed the possibility of moving to a larger courtroom, and (5) members of the public were not permitted back into the courtroom until after the jury was seated even though space became available during voir dire. Rhem's declaration was similar.

After oral argument and several stays pending Supreme Court decisions on various aspects of the public trial issue, we remanded the matter back to the trial court for a reference hearing and directed the court to make findings on the following issues:

1. Whether and to what extent the trial court closed the courtroom to the public during jury voir dire;
2. Whether Petitioner's family members were excluded;
3. Whether Petitioner requested or objected to the closure;
4. Whether the trial court examined the *Bone-Club* factors before ordering the closure;
5. The duration of the closure; and,
6. If there was a closure and the trial court failed to consider the *Bone-Club* factors, whether this closure resulted in actual and substantial prejudice.

Order Lifting Stay and Transferring Pet. to Superior Ct. for Reference Hr'g (Oct. 16, 2013).

Following a reference hearing, the trial court made several findings of fact and conclusions of law and answered the above questions as follows:

1. "The courtroom was effectively closed to the public at sometime the morning of January 13th, through most, perhaps all of the afternoon of January 14th, during the voir dire process."
2. "Members of [Rhem's] family and other members of the public were effectively excluded during voir dire."
3. "Petitioner did not request or object to the closure to members of the public at any time. No attorney requested or objected to closure."
4. "The trial court did not examine the Bone-Club factors, and was not requested to do so."
5. "The closure lasted for most, if not all, of the voir dire process."
6. "No evidence was presented to support any finding of actual and substantial prejudice to the outcome of Rhem's trial. There was no evidence presented at the reference hearing to indicate any effect that a closure had on the decisions of any members of the jury sworn to decide the case. There is no evidence of any closure of the courtroom during any other part of the trial, and balancing this prejudice against the trial court's need to accommodate

10

and make comfortable the jurors leads to a conclusion that, on balance, such prejudice was not substantial."

Pet'r's Suppl. Br. re: *Coggin* and *Speight*, Attach. at 12-13. The trial court also found that "[t]here is no evidence to suggest that after completion of voir dire, there was any closure of the courtroom explicit or perceived." Pet'r's Suppl. Br. re: *Coggin* and *Speight*, Attach. at 9.

After receiving the trial court's findings and conclusions, we allowed further supplemental briefing on the public trial issue. We now address the petition.

ANALYSIS

I. PRP STANDARDS

A PRP is not a substitute for a direct appeal and the availability of collateral relief is limited. *In re Pers. Restraint of Grasso*, 151 Wn.2d 1, 10, 84 P.3d 859 (2004). Generally, to be entitled to relief, the petitioner must show either a constitutional error that resulted in actual and substantial prejudice or a nonconstitutional error that constituted a fundamental defect that inherently results in a complete miscarriage of justice. *In re Cook*, 114 Wn.2d 802, 812, 792 P.2d 506 (1990); *Grasso*, 151 Wn.2d at 10-11.

II. PUBLIC TRIAL CLAIM

Rhem first argues that the trial court violated his right to a public trial under the Washington Constitution[17] when it failed to comply with *Bone-Club* and *Seattle Times Co. v. Ishikawa*, 97

---

[17] Rhem did not raise a public trial claim under the federal constitution until after he obtained appointed counsel. The brief raising the federal claim was filed more than two years after Rhem's convictions became final when his direct appeal mandated in February 2006. Accordingly, this new claim was untimely, *see* RCW 10.73.090, and we will not consider it. We further decline to consider Rhem's argument that our Supreme Court's recent decisions, *Coggin*, 182 Wn.2d at 120-22, and *In re Pers. Restraint of Speight*, 182 Wn.2d 103, 107, 340 P.3d 207 (2014), do not apply to public trial claims under the federal constitution.

Wn.2d 30, 640 P.2d 716 (1982), before excluding the public from the courtroom during voir dire and at some point later during the trial. Art. I, § 22 gives criminal defendants the right to a public trial. *See also State v. Paumier*, 176 Wn.2d 29, 34, 288 P.3d 1126 (2012). Our Supreme Court has "repeatedly held that the public trial right applies to jury selection," including voir dire proceedings during which the jurors are questioned. *In re Pers. Restraint of Coggin*, 182 Wn.2d 115, 118, 340 P.3d 810 (2014) (plurality opinion).

But this right is not absolute; "a trial court may close the courtroom so long as it considers the five criteria outlined in *Bone-Club*." *Coggin*, 182 Wn.2d at 118. Failure to conduct a *Bone-Club* analysis before closing the proceeding is an error. *Coggin*, 182 Wn.2d at 118 (citing *Paumier*, 176 Wn.2d at 35). On direct appeal, because a public trial error is a structural error, prejudice is presumed and the defendant is entitled to a new trial without having to establish prejudice on direct appeal. *Paumier*, 176 Wn.2d at 36-37. This presumption does not, however, apply on collateral review. *Coggin*, 182 Wn.2d at 120-22; *In re Pers. Restraint of Speight*, 182 Wn.2d 103, 107, 340 P.3d 207 (2014).

Thus, to resolve the public trial issue, we must address three issues: (1) whether there was a closure that violated Rhem's state public trial right, (2) if there was then whether the per se prejudice standard that applies on direct appeal also applies to this petition, and (3) if Rhem must establish actual and substantial prejudice, whether he meets this burden. Although we hold that there was a public trial violation, we further hold that Rhem is required to show actual and substantial prejudice on collateral review and that he fails to do so.

A. PUBLIC TRIAL VIOLATION

As noted above, we previously determined that Rhem had stated sufficient grounds to justify a reference hearing on the public trial issue. Also, as noted above, the trial court determined on remand that (1) it had excluded the public during significant portions of jury voir dire, (2) Rhem did not request this closure, and (3) the trial court did not conduct the *Bone-Club* factors before closing the courtroom. The trial court did not find any other closure.

Neither the State nor Rhem challenge these findings. Accordingly, they are verities on appeal. *State v. Alexander*, 125 Wn.2d 717, 723, 888 P.2d 1169 (1995).

Based on these findings, Rhem does not show that there was a closure during trial after voir dire was completed; accordingly, we do not address this issue further. The trial court's findings establish, however, that there was a closure during jury voir dire, that this closure was not invited, and that the trial court failed to consider the *Bone-Club* factors before closing the courtroom. Thus, we hold that Rhem has established that the trial court closed the courtroom during voir dire and that this closure was improper. We next turn to the prejudice issues.

B. ACTUAL AND SUBSTANTIAL PREJUDICE REQUIRED

I. *COGGIN* AND *SPEIGHT*

In *Coggin* and *Speight*, our Supreme Court held that a petitioner must show actual and substantial prejudice to prevail on collateral review of an alleged public trial violation. *Coggin*, 182 Wn.2d at 120-22; *Speight*, 182 Wn.2d at 107 . Rhem argues that *Coggin* and *Speight* are not binding precedent because they are plurality opinions so they do not establish that actual and substantial prejudice standard applies here.

13

We recently rejected an identical argument in *In re Personal Restraint of Schreiber*, 189 Wn. App. 110, 114-15, 357 P.3d 668 (2015).[18]  And our Supreme Court recently reiterated that "[a] principle of law reached by a majority of the court, even in a fractured opinion, is not considered a plurality but rather binding precedent." *In re Detention of Reyes*, ____ Wn.2d ___, 358 P.3d 394, 397 (2015) (citing *Wright v. Terrell*, 162 Wn.2d 192, 195-96, 170 P.3d 570 (2007)).

In *Coggin* and *Speight*, four justices joined the lead opinions.  And Chief Justice Madsen authored a concurring opinion in which she agreed with the lead opinion on the substantial prejudiced issue.  Therefore, we reject Rhem's argument that *Coggin* and *Speight* are not binding precedent.  Accordingly, Rhem must establish actual and substantial prejudice unless he can establish an exception to this requirement applies.

## 2. MORE LENIENT STANDARD DOES NOT APPLY

Rhem further argues that a more lenient standard, requiring that he need only show that he is under "unlawful restraint," should apply here.  He argues that this was his first opportunity for judicial review because this court would not have reviewed the merits of his public trial violation argument if he had raised it in a direct appeal, as demonstrated by the need for the reference hearing in this matter to develop the necessary facts.[19]  Rhem is correct that a petitioner may not be required to establish actual and substantial prejudice if he has had no prior "opportunity for judicial review." *See In re Pers. Restraint of Grantham*, 168 Wn.2d 204, 205, 227 P.3d 285 (2010).  But we hold that he reads this exception to the actual and substantial prejudice requirement too broadly.

---

[18] Petition for review pending.

[19] Respondent does not address this argument.

We do not require petitioners to establish actual and substantial prejudice in two circumstances. First, when the challenged decision, such as a prison disciplinary decision or community custody violation finding by the Department of Corrections (DOC), was not made by a judicial officer but, rather, by an "executive officer" and there is no other avenue for judicial review of the decision. *Grantham*, 168 Wn.2d at 205 (addressing prison disciplinary infraction by the DOC); *In re Pers. Restraint of Dalluge*, 162 Wn.2d 814, 817, 177 P.3d 675 (2008) (addressing violations of community custody conditions that were found by the DOC). Second, when the issue raised did not exist at the time of the appeal, such as when a trial court adds a community custody condition to a judgment and sentence after the time to appeal has expired or the petitioner is raising an ineffective assistance of appellate counsel claim.[20] *In re Pers. Restraint of Isadore*, 151 Wn.2d 294, 299, 88 P.3d 390 (2004) (addressing a term of community placement that the trial court added to the original sentence after the time for appeal had expired); *In re Pers. Restraint of D'Allesandro*, 178 Wn. App. 457, 469, 314 P.3d 744 (2013) (addressing ineffective assistance of appellate counsel claim), *review denied*, 182 Wn.2d 1021 (2015).

What these types of claims have in common is that there was no opportunity for any judicial review of the decision at issue (the infraction, the violation, the new sentence, or the appeal). This is not the case here. The decision here was clearly judicial and, unlike the petitioners in *Grantham*, *Dalluge*, *Isadore*, and *D'Allesandro*, Rhem has already had an opportunity for judicial review of his convictions and his sentences.

---

[20] Rhem also cites *Cook*, 114 Wn.2d at 810, but *Cook* does not discuss the prejudice requirement on collateral review when there was no prior opportunity for review. Accordingly, we do not address *Cook*.

Rhem does not cite, nor can we locate, any cases stating that the actual and substantial prejudice standard does not apply on collateral review when the petitioner had a prior opportunity for judicial review of his convictions and sentences, *but a particular issue* could not have been resolved based solely on the record before the appellate court. We have, however, located one case, *In re Personal Restraint of Jensen*, 125 Wn. App. 319, 104 P.3d 717 (2005), that suggests we have applied a more lenient standard when a petitioner raised an ineffective assistance of *trial* counsel claim in a PRP and a reference hearing was required to resolve this issue. But in *Jensen*, we mentioned that this was the petitioner's first opportunity for judicial review only in the context of whether he was entitled to a reference hearing on factual issues related to the ineffective assistance of counsel claim, we did not address whether the petitioner had to show actual and substantial prejudice in order to obtain relief. 125 Wn. App. at 333 (citing *Isadore*, 151 Wn.2d at 299). Although we remanded for a reference hearing, we still required the trial court to find prejudice[21] before granting relief. Thus, *Jensen* does not support Rhem's assertion that he is not required to establish actual and substantial prejudice.

We hold that Rhem is required to establish actual and substantial prejudice. We next turn to whether Rhem has met that burden.

C. NO ACTUAL AND SUBSTANTIAL PREJUDICE

Following the reference hearing, the trial court determined that Rhem had not established actual and substantial prejudice. In his supplemental brief addressing the trial court's reference

---

[21] Specifically, we required the trial court to find that defense counsel had "an actual conflict of interest *that adversely affected his representation of Jensen*." *Jensen*, 125 Wn. App. at 335 (emphasis added).

hearing findings, Rhem does not challenge the trial court's findings on this issue. Therefore, these findings are verities. Nor does he assert that the trial court misapplied the law when it required evidence that the closure had an effect on the members of the jury. He cannot now argue that there was actual and substantial prejudice.

In his final supplemental reply, however, Rhem argues that under *In re Personal Restraint of Orange*, 152 Wn.2d 795, 812, 100 P.3d 291 (2004), the prejudice was that (1) the prospective jurors could see that Rhem's family was not participating in the jury selection process, and (2) the family could not participate in the process.

Generally, we will not consider arguments raised for the first time in a responsive brief. *State v. Chen*, 178 Wn.2d 350, 358 n.11, 309 P.3d 410 (2013) (citing *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992)). We decline to do so here.

Accordingly, because Rhem does not establish actual and substantial prejudice, his public trial claim fails.[22]

III. VIOLATION OF ORDER IN LIMINE

Rhem next argues that a trial court order in limine prohibiting evidence related to a 10 mm weapon and references to the previous trial were repeatedly violated during the second trial.[23] These arguments fail.

---

[22] Rhem also argues that he received ineffective assistance of trial counsel because his trial counsel did not object to the public trial violation. Because there is no prejudice, this ineffective assistance of counsel argument fails. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995) (to establish ineffective assistance of counsel, the defendant must show both deficient performance and prejudice).

[23] The State suggests we already addressed the firearm issue in the second direct appeal. Although we addressed the admission of evidence about the .45 caliber and 9 mm firearms, we did not address any issues involving the 10 mm firearm evidence. *Wynn*, 2005 WL 470049, at *5-6.

A violation of an order in limine can be a trial irregularity, but not all such violations are considered so serious as to deprive the defendant of a fair trial. *State v. Thompson*, 90 Wn. App. 41, 46-47, 950 P.2d 977 (1998). To determine whether an irregularity deprived a defendant of a fair trial, we consider the following factors: (1) the seriousness of the irregularity, (2) whether the statement in question was cumulative, and (3) whether the irregularity could be cured by an instruction to disregard the remark, an instruction that the jury is presumed to follow. *State v. Escalona*, 49 Wn. App. 251, 254, 742 P.2d 190 (1987). We review claims of prejudice against the backdrop of all the evidence. *Escalona*, 49 Wn. App. at 254.

### A. 10 MM FIREARM REFERENCES

The trial court ruled that evidence of Rhem's and Wynn's possession of any firearms not used in the charged offense, a .45 firearm and a 9 mm firearm, was excluded. *See Wynn*, 2005 WL 470049, at *2. It later emphasized that this ruling specifically excluded reference to the fact either defendant possessed a 10 mm firearm.[24]

Rhem contends that the order in limine was violated when "[t]here were several instances of mentioning that [he] possessed a .10 [sic] mm firearm." PRP at 5. But he cites to the portion of the record that relates to a motion that was heard outside the jury's presence. The only references to Rhem possessing a 10 mm firearm the jury heard were (1) witness Henderson's testimony that in another shooting incident following the charged incident, Rhem had possessed and fired "a Smith & Wesson 10 mm" (6 RP at 584), and (2) the State referring to this testimony

---

[24] Respondent argues that there was no motion in limine relevant to Rhem's argument. We disagree. The record clearly shows that the trial court prohibited references to Rhem and Wynn possessing any firearm other than the type of firearm used in the offenses, a 9 mm and a .45 caliber.

in its closing argument. The evidence at issue here could be characterized as habit evidence under ER 406 or as other bad acts evidence under ER 404(b).

This irregularity was not serious and was essentially cumulative. Although it was arguably a violation of the order in limine, these were brief comments in a seven-day-long trial amid a significant amount of testimony about Rhem and Wynn possessing other weapons. And this irregularity could have been cured by an instruction to disregard this evidence and argument or to prohibit the use of this evidence as habit evidence.

Furthermore, Rhem does not show that this apparent violation of the order in limine was of constitutional magnitude,[25] and he fails to show that these errors constituted a fundamental defect that inherently results in a miscarriage of justice.[26] Henderson's brief testimony and the State's brief reference to this testimony, although arguably a violation of the order in limine, did not inherently result in a complete miscarriage of justice, particularly given the additional evidence that demonstrated that Rhem was carrying a gun during other shooting incidents. Accordingly, this argument fails.

---

[25] Erroneous admission of ER 404(b) evidence is not of constitutional magnitude. *State v. Mezquia*, 129 Wn. App. 118, 131, 118 P.3d 378 (2005). And the risk of admitting ER 406 evidence is similar to that encountered when admitting ER 404(b) evidence in that there is a risk that ER 406 evidence will be seen as character evidence. *Norris v. State*, 46 Wn. App. 822, 826, 733 P.2d 231 (1987) ("Caution is essential in dealing with habit evidence, because it verges on inadmissible evidence of character.")

[26] Because Rhem does not establish prejudice, his ineffective assistance of counsel claim based on counsel's failure to propose the proper limiting instruction or object to any testimony about the 10 mm firearm fails. *McFarland*, 127 Wn.2d at 334-35.

## B. Prior Trial References

Rhem further contends that the mention of a prior "trial" was in violation of the order in limine.[27] This argument also fails.

The record shows that although the trial court prohibited any mention of the results of the prior trial and had asked counsel to refer to prior proceedings rather than a prior trial, there were a few instances in which witnesses or Rhem's counsel referred to Rhem's "prior trial"[28] rather than a "prior proceeding." First, during witness Henderson's testimony, when discussing his obligations under a plea agreement, he mentioned that he had agreed to "be a witness in the *prior trial to this one* -- there was another one -- or a prior whatever." 6 RP at 587 (emphasis added). Second, Henderson again mentioned his testimony at a previous "trial."[29] 6 RP at 618. And third, when questioning Matthews, Rhem's counsel asked her, "Do you recall testifying consistent with those words at the last trial?" 5 RP at 500. There was, however, no mention of the outcome of the prior trial. And throughout the trial there were several references to prior proceedings or hearing when the parties attempted to refresh a witness's recollection or impeach a witness's testimony.

---

[27] Respondent argues that the record does not show that the trial court ordered "that there be no references to the fact of the first trial." State's Resp. at 14. Again, we disagree. The record shows that the trial court excluded references to the result of the first trial and requested that counsel not allow witnesses to refer to the previous trial.

[28] There were also numerous times the parties and witnesses referred to prior proceedings. But this was within the scope of the order in limine.

[29] At one point when questioning Henderson, Rhem's counsel also referred to Henderson's "prior trial." 6 RP at 609. Because this was not a reference to Rhem's prior trial, we do not consider this reference.

Taking the record as a whole, these few brief mentions of a prior trial during this seven-day-long trial were de minimis. Additionally, the jury repeatedly heard about prior testimony at some type of hearing or proceeding, often in contexts that would suggest it was a prior trial. And the jury was also aware that the charged offenses were related to several additional shooting incidents that could have resulted in numerous trials. Given these facts, these three references to a prior trial, although arguably in violation of the order in limine, were not serious. Furthermore, an instruction to disregard these references could have cured any potential prejudice. *Escalona*, 49 Wn. App. at 254. Accordingly, Rhem has not shown that this violation of the order in limine caused actual and substantial prejudice or a fundamental defect that inherently results in a complete miscarriage of justice and this argument fails.[30]

## IV. WYNN'S STATEMENT

Rhem next argues that a violation of his right to a fair trial occurred through the admission of Wynn's statement, apparently through Detective Davidson's testimony, and that the redactions of his name were insufficient.[31] We disagree.

### A. ADDITIONAL FACTS

According to Detective Davidson's testimony, Wynn's statement to Detective Davidson contained the following sentence regarding the Wilkeson Street shooting: "[Wynn] said that he

---

[30] Rhem also raises a related ineffective assistance of trial counsel claim. Because he does not establish prejudice, this ineffective assistance of counsel claim also fails. *McFarland*, 127 Wn.2d at 334-35.

[31] Although we addressed an issue related to Wynn's statement in the second appeal, the challenge in the appeal was to a different part of Wynn's statement and was not a *Bruton* issue. *See Wynn*, 126 Wn. App. 1008, at *9-10. Accordingly, Rhem is not prevented from raising this issue in his PRP.

heard a gunshot and saw [Rhem] in the front yard of the house next door." 9 RP at 1140. The redacted sentence replaced the reference to Rhem with "someone." 9 RP at 1140. The trial court found the redactions appropriate.

Detective Davidson testified about Wynn's statement:

Well, Mr. Wynn stated that he had been at a person by the name of Shawn the Mechanic's house and that he had been out in the front yard talking with a person by the name of Chris Heads and that he heard a gunshot and saw a person standing in the yard to the south of where he was at, shooting at Rodney Hebert's white Caprice Classic as it traveled northbound on Wilkeson Street and then westbound on South 23rd Street.

9 RP at 1147-48 (emphasis added).

After the State asked Detective Davidson if Wynn had made any statements about where he might have been at the Ash Street shooting, the detective further testified,

Well, yes, he stated that he had been at his aunt's house, at the barbecue. At about, approximately, 45 to 60 minutes after the shooting at the barbecue, he stated that Latron Swearington had come over and picked him up in his blue Caprice. He stated that they drove up to the AM/PM at South 12th and Sprague to see if anybody knew -- if anybody up there knew who had shot at them. When we asked why they chose to go up there to find that out, he stated that that was just where everybody hung out. He stated that they had been there about five minutes when he, again, was shot at and actually was grazed in the thigh.
He stated that, after that particular shooting, Latron Swearington dropped him back off at his aunt's house and that he then drove his own car, the one that had been shot up earlier in the barbecue shooting, to pick up his girlfriend by the name of Alisha Rorie at her place of employment.

9 RP at 1149-50. It is not clear from the record what portions of this testimony were redacted to exclude references to Rhem.

Later, the detective testified,

Well, I wanted to make sure of what [Wynn] was telling me, so I asked him specifically, I said, "Is what you're saying is that, from the time Mr. Swearington picked you up 45 to 60 minutes after the shooting at the barbecue, until the time you were shot at at the AM/PM and grazed, that you were with Latron Swearington

and other's in Latron's car that entire time period?" And he said that was correct, that's what he was saying.

9 RP at 1153. It is also not clear from the record what portion of this testimony was redacted to exclude references to Rhem.

## B. ANALYSIS

We review de novo alleged violations of the confrontation clause. *State v. Larry*, 108 Wn. App. 894, 901-02, 34 P.3d 241 (2001). Under *Bruton*, a defendant may be deprived of his confrontation rights under the Sixth Amendment if he is incriminated by a pretrial statement of a codefendant who does not take the stand. *Larry*, 108 Wn. App. at 902. But such a confession that is redacted to omit all references to the codefendant and not "'incriminating on its face'" is not a violation of the defendant's confrontation rights. *Larry*, 108 Wn. App. at 902 (quoting *Richardson v. Marsh*, 481 U.S. 200, 208, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987)). This is so even if the statement may become incriminating when linked with other evidence introduced at trial. *Larry*, 108 Wn. App. at 902 (quoting *Richardson*, 481 U.S. at 208).

Redacted statements must be (1) facially neutral, i.e., not identify the nontestifying defendant by name, (2) free of obvious deletions such as blanks or a placeholder such as an "X," and (3) accompanied by a limiting instruction. *Larry*, 108 Wn. App. at 905. Here, the statements, as introduced through Detective Davidson's testimony, were facially neutral and were free from any obvious deletions.[32] And although the record before us does not contain any limiting instruction related to Wynn's statements, Rhem does not allege that the trial court failed to give

---

[32] In fact, even knowing that there were alterations, it is difficult to tell when reading the record exactly where these alterations occurred.

the jury a proper limiting instruction. Because this is a PRP, Rhem has the burden of establishing actual and substantial prejudice, and he has failed to do so.

Furthermore, Wynn's statement, as described by Detective Davidson, in no way directly implicated Rhem. The only possible prejudice was that other witness testimony and statements implicated Rhem. But a statement does not violate *Bruton* even if the statement may become incriminating when linked with other evidence introduced at trial. *Larry*, 108 Wn. App. at 902 (quoting *Richardson*, 481 U.S. at 208). Thus, Rhem does not establish that the admission of testimony about Wynn's redacted statement was actually and substantially prejudicial. Accordingly, Rhem's *Bruton* argument fails.

## V. SENTENCING ISSUES

### A. SAME CRIMINAL CONDUCT: CURRENT OFFENSES

Rhem next argues that the trial court erred by treating his current offenses as separate offenses for purposes of his sentence and his offender score. We disagree.

Offenses constitute same criminal conduct if the offenses require the same criminal intent, are committed at the same time and place, and involve the same victim. Former RCW 9.94A.400(1)(a) (1998). Here, however, each first degree assault involved a different named victim and the victim of the UPF offense was the general public. *See State v. Haddock*, 141 Wn.2d 103, 110-11, 3 P.3d 733 (2000) ("[T]he victim of the offense of [UPF] is the general public. Because the victims are all different, these offenses are not same criminal conduct and this argument fails.

### B. CONSECUTIVE SENTENCES NOT EXCEPTIONAL SENTENCES

Rhem next argues that running his two assault sentences consecutively amounted to an exceptional sentence and that this sentence was improper because the trial court failed to support the consecutive sentences with written findings of fact and conclusions of law as required in former RCW 9.94A.120(3) (1998), and the facts supporting the exceptional sentences were not found by a jury. But our Supreme Court has held that consecutive sentences for serious violent offenses are not exceptional sentences. *State v. Cubias*, 155 Wn.2d 549, 556, 120 P.3d 929 (2005). And the statute requiring that these sentences be consecutive, former RCW 9.94A.400(1)(b),[33] did not require the trial court to make findings. Accordingly, this argument fails.

### C. SAME CRIMINAL CONDUCT: PRIOR OFFENSES

Rhem next argues that the trial court erred by failing to consider some of his prior offenses to be same criminal conduct when calculating his offender scores. Specifically, he asserts that the prior first degree possession of stolen property and felony attempting to elude convictions were

---

[33] Former RCW 9.94A.400(1)(b) provided, in part,

> Whenever a person is convicted of two or more serious violent offenses, as defined in [former] RCW 9.94A.030 [1998] arising from separate and distinct criminal conduct, the sentence range for the offense with the highest seriousness level under [former] RCW 9.94A.320 [1998] shall be determined using the offender's prior convictions and other current convictions that are not serious violent offenses in the offender score and the sentence range for other serious violent offenses shall be determined by using an offender score of zero. The sentence range for any offenses that are not serious violent offenses shall be determined according to (a) of this subsection. *All sentences imposed under (b) of this subsection shall be served consecutively to each other* and concurrently with sentences imposed under (a) of this subsection.

(Emphasis added.)

same criminal conduct because the stolen property was the vehicle in which he attempted to elude law enforcement.

Because Rhem stipulated that each of these offenses counted as one point in his offender score, he has waived his right to challenge this aspect of his offender score calculation. *See In re Pers. Restraint of Shale*, 160 Wn.2d 489, 494-95, 158 P.3d 588 (2007) (citing *In re Pers. Restraint of Goodwin*, 146 Wn.2d 861, 873-74, 50 P.3d 618 (2002); *State v. Nitsch*, 100 Wn. App. 512, 997 P.2d 1000 (2000)). Accordingly, this argument fails.

### D. USE OF JUVENILE ADJUDICATIONS IN OFFENDER SCORES

Rhem next argues that the trial court erred by including his prior juvenile adjudications in his offender scores because juvenile adjudications do not allow for jury trials, were not "convictions," and were not facts that were submitted to the jury. Our Supreme Court rejected these arguments in *State v. Weber*, 159 Wn.2d 252, 262-64, 149 P.3d 646 (2006). Accordingly, this argument fails.

### E. NO PRE-15 JUVENILE ADJUDICATION INCLUDED IN OFFENDER SCORE

Rhem next argues that the trial court erred by including a prior juvenile adjudication that he committed before he turned 15 years old in his offender scores. Specifically, he asserts that his judgment and sentence includes a 1990 juvenile burglary.

Rhem's judgment and sentence does not refer to a juvenile burglary committed in 1990.[34] The earliest prior offense noted is a second degree theft committed in October 1990, after Rhem

---

[34] Rhem's prior judgment and sentence does appear to include this offense; but that judgment and sentence is not at issue here.

turned 15 in September 1990. Thus, the trial court did not include any offenses committed before Rhem turned 15 in his offender scores. Accordingly, this argument fails.

## VI. DOUBLE JEOPARDY CLAIM

Rhem argues that imposing the firearm sentencing enhancements on the two assaults constituted double jeopardy because the use of a firearm was an element of the offense. Our Supreme Court has rejected this argument in *State v. Kelley*, 168 Wn.2d 72, 84, 226 P.3d 773 (2010). Accordingly, this argument fails.

## VII. RESPONDENT'S REQUEST FOR REMAND TO CORRECT JUDGMENT AND SENTENCE

Finally, Respondent asserts that the judgment and sentence contains errors that should be corrected.

First, Respondent asserts that the 183-month sentence the trial court appeared to impose on count II, the second assault conviction, erroneously included the 60-month firearm sentencing enhancement and that the trial court instead intended to impose a 123-month sentence with a 60-month enhancement. But this issue was resolved when the trial court entered an order correcting the judgment and sentence on July 17, 2012. Accordingly, this issue is now moot.

Second, Respondent asserts that the first degree UPF charge to which Rhem pleaded guilty should be included in the 2003 judgment and sentence. Respondent is correct that the 2003 judgment and sentence does not include a sentence for the UPF guilty plea conviction, although it does include this offense in Rhem's criminal history. But this issue is beyond the scope of this petition and we decline to address it. Respondent should, however, ensure that a proper judgment and sentence addressing the UPF guilty plea conviction is filed.

No. 35195-1-II

Accordingly, we deny this petition and deny Respondent's request to remand for correction of the judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Johanson, C.J.

JOHANSON, C.J.

We concur:

MAXA, J.

MELNICK, J.